**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**T. A. McGAHEY, Sr., T. A. McGahey, Jr., Mrs. Altie McGahey Jones and Mrs. Wilda Frances McGahey Harrison, doing business as Columbus Marble Works, a Partnership, Respondents.**

No. 15691.

United States Court of Appeals Fifth Circuit.

May 18, 1956.

Rosanna A. Blake, Atty., N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Norton J. Come, Atty., N. L. R. B., Washington, D. C., for petitioner.

W. J. Threadgill, Columbus, Miss., W. Gordon McKelvey, Nashville, Tenn., John H. Holloman, Columbus, Miss., for respondents.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

This Petition to enforce the order of the Board against Columbus Marble Works presents the usual contention, controversy, disagreement and dispute. It

408

begins with the Employer [1] challenging the basic legality of the Board's order [2] because the Charge, upon which the complaint had to rest, was not served upon each of the members of the Employer-partnership. The Employer's argument is that since the 1947 Act put a six-months' pre-Charge time limit [3] on Complaints and Orders, the whole process depends on service of such Charge in strict accordance with the Act.

The original Charge against Columbus Marble Works, October 27, 1952, and the Amended Charge of December 19, 1952, were each served by registered mail addressed to Columbus Marble Works, Columbus, Mississippi, and receipted for by an authorized mail clerk. The ruling figure of this enterprise "President", T. A. McGahey, Sr., had actual knowledge of the receipt of this Charge and undertook by a letter as "President" to detail the Company's position why the discharge of Ferguson and Hollinger was lawful. But none of the

partners was listed by name, and in the original Complaint filed June 9, 1953, only the two McGaheys were listed as the partners "d/b/a Columbus Marble Works, a Partnership." The remainder of the family partners were not formally brought in until an Amendment to the Complaint January 4, 1954, on the eve of the hearing.

Conceding, as they must, that registered mail as a *means* or method is expressly [4] permitted the Employer contends that such service must be upon, and hence must be mailed to, the "*person against whom such charge is made*" which in Mississippi is each of the partners since the entity has no status to sue or be sued, Blackwell v. Reed, 41 Miss. 102; Tabler v. Bryant, 62 Miss. 350; Enochs-Flowers v. Bank of Forest, 172 Miss. 36, 157 So. 711, 159 So. 407; American Jurisprudence, Vol. 40, Partnerships, Section 434, page 432.

But this ignores, we think, the intrinsic definition [5] of "person" which

1. Columbus Marble Works is a Mississippi partnership composed of T. A. McGahey, Sr., T. A. McGahey, Jr., Mrs. Altie McGahey Jones, Mrs. Wilda Frances McGahey Harrison. Oddly enough, while pressing the strict Mississippi concept of the partnership entity, official record correspondence reflects that the business is done as "Columbus Marble Works" with T. A. McGahey and T. A. McGahey, Jr. listed as President and Vice-president, respectively.

2. The Board's decision is reported 111 N.L.R.B. 1162. Except that it rejects the Trial Examiner's finding that T. A. McGahey, Sr. engaged in surveillance of a Union meeting mid-December 1952, it approved the other recommendations to hold that the employer had interfered with, restrained and coerced its employees by interrogating various employees and threatening reprisals for Union activity in violation of § 8(a) (1), 29 U.S.C.A. § 158; and had violated § 8(a) (3), 29 U.S.C.A. § 158, by discharging Charlie Dean Ferguson and Belton Hollinger because of Union membership and activity. The Order required Employer to cease and desist as to the future and to restore Ferguson and Hollinger to their former jobs with back pay. The

Board has filed this Petition for Enforcement.

3. The relevant portion of § 10(b), 29 U.S.C.A. § 160, provides: "Whenever it is charged that any person has engaged in * * * any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, * * *."

4. Section 11(4), 29 U.S.C.A. § 161, provides: "Complaints, orders, and other process and papers of the Board, its member, agent, or agency, may be served either personally or by registered mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served. * * *"

5. Section 2(1), 29 U.S.C.A. § 152: "The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers."

plainly includes a partnership. The Act is fulfilled where the registered notice is sent to that person—the partnership addressed under its usual business name—where, as is so evident here, it was actually received and brought to the attention and active consideration of those in responsible direction of the partnership's business affairs. The objective of the Charge and the six-months' time limitation on it is to give notice when time, the freshness of the events, and the availability of witnesses afford some practical means of refutation, explanation, and defense. When that aim is satisfied in substantial fact, a technical procedural imperfection will not invalidate the whole proceeding. Olin Industries, Inc. v. N. L. R. B., 5 Cir., 192 F.2d 799, certiorari denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332; N. L. R. B. v. Westex Boot and Shoe Co., 5 Cir., 190 F.2d 12. The service of the Charge was therefore adequate.

■ When it comes to the merits of the claim of Section 8(a) (1) interference, we think that the Board's order must be enforced. This results from the nature of our function in the review of these cases. We may, and do, exact compliance with the standard that the Board's conclusion must be substantiated by trustworthy substantial evidence on the record taken as a whole, N. L. R. B. v. Riverside Mfg. Co., 5 Cir., 119 F.2d 302; N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260; N. L. R. B. v. Huber & Huber Motor Express, Inc., 5 Cir., 223 F.2d 748; N. L. R. B. v. C. & J. Camp, Inc., 5 Cir., 216 F.2d 113; N. L. R. B. v. National Paper Co., 5 Cir., 216 F.2d 859; N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 211 F.2d 848; N. L. R. B. v. Blue Bell, Inc., 5 Cir., 219 F.2d 796, but we are not the fact-finder whose function it is to accept or reject, credit or discredit, conflicting versions of factual events and the inferences to be drawn from them. N. L. R. B. v. Poultry Enterprise, Inc., 5 Cir., 207 F.2d 522; N. L. R. B. v. Goodyear Tire & Rubber Co., 5 Cir., 129 F.2d 661, certiorari dismissed 319 U.S. 776, 63 S.Ct. 1026, 87

L.Ed. 1723; Jacksonville Paper Co. v. N. L. R. B., 5 Cir., 137 F.2d 148, certiorari denied 320 U.S. 772, 64 S.Ct. 84, 88 L.Ed. 462; N. L. R. B. v. Coats & Clark (Acworth Plant), 5 Cir., 231 F.2d 567; N. L. R. B. v. Nabors, 5 Cir., 196 F.2d 272; N. L. R. B. v. Russell Mfg. Co., 5 Cir., 191 F.2d 358.

In this light, with testimony from many employees of persistent interrogation by McGahey, Sr. concerning their views on the question of unionizing the plant and the statements attributed to McGahey, Sr. showed, if credited, a purpose to interfere with employees' rights.

■ This is not to penalize the employer because of antiunion bias for we recognize that antiunion bias, strong convictions against unions or opposition to the underlying philosophy of the Labor Management Relations Act is not itself an unfair labor practice. In a free democracy, it is the citizen, not the Government, who fixes his own beliefs. The personal views of McGahey, or his colorful, forceful means of expression, do not, unless voiced in manner or circumstance warranting the inference of a purpose to thwart, impede or discourage the plain and statutory rights of employees, violate the law, or infuse power in the Board to coerce a change of heart. N. L. R. B. v. Goodyear Tire & Rubber Co., supra; N. L. R. B. v. Williamson-Dickie Mfg. Co., supra; Jacksonville Paper Co. v. N. L. R. B., supra; N. L. R. B. v. Riverside Mfg. Co., supra. McGahey must, of course, obey the law, but he need not believe in it. He may carry the McGahey beliefs to a McGahey-marked grave.

■ Nor is it to punish the employer because McGahey made inquiries whether the employees did or did not desire union representation. This is permissible under the Act. Had these been casual, moderate inquiries by McGahey unrelated to evidence indicating that employees had ground to consider them as forecasting reprisals, these acts would not have been an unfair labor practice. N. L. R. B. v. Blue Bell, Inc., supra; N. L. R. B. v. Nashua Mfg. Corp. of Tex-

as, 5 Cir., 218 F.2d 886, citing with approval N. L. R. B. v. Montgomery Ward & Co., 2 Cir., 192 F.2d 160; N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370; Sax v. N. L. R. B., 7 Cir., 171 F.2d 769. But interrogation becomes unlawful when it is a part of the means by which the employer's hostility carries with it the purpose to retaliate against Union sympathizers and, by threat of job or other reprisals, coerce them into a vote of action which does not express their free will.

▆ The open threat to Hartley [6] to shut down the plant, especially when coupled with comparable menacing predictions made to Hollinger,[7] was ample, if believed, to sustain the conclusion that the employer was undertaking to discourage the employees in exercising rights secured to them by the Act. N. L. R. B. v. Rutter-Rex Mfg. Co., 5 Cir., 229 F.2d 816; N. L. R. B. v. Coats & Clark (Acworth Plant), supra; N. L. R. B. v. Denton, 5 Cir., 217 F.2d 567; N. L. R. B. v. Nabors, supra; N. L. R. B. v. Poultry Enterprises, Inc., supra; N. L. R. B. v. Nashua Mfg. Corp., supra; N. L. R. B. v. Williamson-Dickie Mfg. Co., supra.

▆ But the claim of an 8(a) (3) unlawful discharge of Ferguson, a shipping clerk, and Hollinger, a crane operator, stands quite differently. The finding of 8(a) (1) guilt does not automatically make a discharge an unlawful one or, by supplying a possible motive, allow the Board, without more, to conclude that the act of discharge was illegally inspired. Indeed, we have frequently sustained 8(a) (1) charges while rejecting those under 8(a) (3), N. L. R. B. v. Riverside Mfg. Co., supra; N. L. R. B. v. Williamson-Dickie Mfg. Co., supra; N. L. R. B. v. Goodyear Tire & Rubber Co., supra; N. L. R. B. v. Coats & Clark (Acworth Plant), supra; N. L. R. B. v. Russell Mfg. Co., supra; N. L. R. B. v. Denton, supra.

The Board found Ferguson was discharged for union activities on Ferguson's testimony that some time prior to September 22, Cox, the superintendent, cautioned Ferguson against his talking so much for the union and, confirming his discharge, expressed regret that McGahey had taken such action although Cox had, he reminded Ferguson, warned him against that likelihood if he did not change his ways.

The Board's finding of an 8(a) (3) discharge of Hollinger, an ordinary crane operator, rested solely on Hollinger's testimony concerning the event described in note 7 and that occurring on the day of his discharge, October 6, when he sought explanation [8] from McGahey, Sr.

---

6. Hartley, as were others, was called to McGahey Sr.'s office. McGahey prefaced his remarks, "Well, now, this is not concerning the union any way at all. * * * you are a man of your own. You can vote any way you want to but I just want to call you boys in and talk with you and tell you my theory of it." Hartley related that McGahey then said, "I am not going under the union. * * * I will shut down before I will let the other man boss my business. * * * Folks don't have to have tombstones anyway. I am not going to let the other fellow run my business."

7. On October 2, the day the Union filed its representation petition, Hollinger, a crane operator, was summoned to the front office. McGahey, Sr., stated, "There is going to be a union here" and then asked Hollinger, "Are you for the union or against it?" When Hollinger replied merely, "That all depends", McGahey insisted, "You will have to say yes or no." To Hollinger's answer, "Yes, a hundred percent", McGahey's response was, "Well, John, I guess you know that we are going to blackball all of that [sic] are for the union with [he named several local employing concerns] * * and all of those other places."

8. Hollinger stated to McGahey, "Mr. McDaniels said that you said to lay me off at dinner time, to let me go." McGahey exclaimed: "Lay you off, hell. You are fired, by God." When Hollinger inquired: "Mr. Mac, what is the trouble, my work not satisfactory?" McGahey replied: "Yes, but hell, what are you doing now?" Hollinger asked, "Well, what is it I am doing now?", to which McGahey's answer was "Oh, hell, you will never work for The Columbus Marble people any more." He was reemployed on July 13, 1953,

■ The employer acknowledged the layoffs (or discharges) but had quite different reasons. Ferguson was the victim, not of antiunionism, but really of nepotism. He lost out because a close relative of the partners, Whitten, who in prewar years had been the shipping clerk, was proving himself to be unsuccessful as a traveling salesman, and a job had to be found for him when the employer took him off the road. McGahey and Jones (the husband of one of the partners) decided to give him Ferguson's job since, for the reasons discussed in Hollinger's case, business was slack and the plant could not take on an additional man.

■ Hollinger was the victim not of union hostility but of the economic forces of supply and demand. In Fiscal 1952 (July 1, 1951 to June 30, 1952) the plant had enjoyed a favorable contract with United States Government for military headstones. The volume (approximately 30,000 stones) and ratio to civilian (approximately 4,000 stones) business was high. The bid for Fiscal 1953 (period beginning July 1, 1952 to June 30, 1953) was higher than competitors and it soon became evident that the plant would get little Government business. As this recession [9] became evident, the Management decided that drastic cuts in the labor force were demanded. These were made.[10] The decision to lay off Hollinger was that of McGahey personally. With shrinking business, a man to work exclusively as operator of Hollinger's crane was not needed. McGahey, as his own personal decision, then determined to lay off Hollinger rather than Porter, another crane operator, since Porter could do other work, principally welding, needed nearly every week in the maintenance of special stone sawing equipment. These facts were convincingly established by Jones, who worked closely with McGahey, although Hollinger's recitation of the conversations between him and McGahey were formally unrefuted because of the stipulated inability of McGahey, in advancing years and under a severe heart attack, to testify.

■ The close family nature of this business, the practice to favor relatives in job openings and advancement, and the severe decline in the company's business stand here as undisputed facts solidly proved. Each was a perfectly sufficient explanation for the discharge of the particular employee and would itself sustain the burden, if it rested upon the employer, that the discharge of each was for the stated reasons. But the employer does not bear this duty. It is, rather on the General Counsel to establish by acceptable substantial evidence on the whole record that discharge came from the forbidden motives of interference in employee statutory rights. The burden long imposed by this Court, N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir., 222 F.2d 431; N. L. R. B. v. Brady Aviation Corp., 5 Cir., 224 F.2d 23; N. L. R. B. v. Alco Feed Mills, 5 Cir., 133 F.2d 419; N. L. R. B. v. Tex-O-Kan Flour Mills, 5 Cir., 122 F.2d 433; N. L. R. B. v. Ray Smith Transport Co., 5 Cir., 193 F.2d 142, has added sanction by express terms of the Act.[11]

and was still working for the employer at the time of the hearing in 1953.

9. The prophecy based on July to September operations was well founded. In Fiscal 1953 the Government headstones delivered numbered 4,751 in contrast to 30,000 in Fiscal 1952. Civilian business remained substantially constant.

10. About June 25, 1952, 31 employees were laid off; in July there were 24 more followed by 3 in August, 4 in September and 10 in October. While deliveries under Fiscal 1952 contract were completed about July 1953, the work being done gradually declined as the employer was receiving and processing rough stones purchased from suppliers in anticipation (not fulfilled) of substantial orders the Government would file under the 1953 Fiscal blanket bid.

11. § 10(c), 29 U.S.C.A. § 160: "No order of the Board shall require the reinstatement of any individual * * * or the payment to him of any back pay, if such individual was suspended or discharged for cause."

Moreover, there is no substantial proof which would warrant an inference that this employer, in the face of a record of numerous routine personnel changes and discharges, would reach down and pick out two such obscure figures. If, for example, Ferguson was talking so much for the union (as Cox is supposed to have said) would there not be some proof that he had done so, and was, thereby in the eyes of himself and his fellow employees, considered a leader in the union movement? But all that the evidence showed, all the Board could find, was that, in Ferguson's own mild estimation, "I did boost it [the AFL] because I was for the Union all the time."

There is even less as to Hollinger, whose general credibility was severely shaken by denials, retractions and contradictions. An admitted illiterate, absent frequently from work because of illness or the demands (or appeal) of his wife's fishing business, he is not shown to have ever said a word, done an act, or anything which could have been thought, by even the most indulgent, to be union-promotional work. He had no following. To fire him (or Ferguson) would serve as no example to the others.

Nor will other circumstances relied on by the Board supply the essential fact basis from which an inference of unlawful motive can be drawn. For example the Board with a change of pace first rejects Superintendent [12] Cox's denial of the statements attributed to him by Ferguson largely on the ground that Cox's claim that he knew nothing of Whitten taking Ferguson's place until it was over was simply beyond belief. But his similar statement about the reason for Hollinger's discharge, "I don't know any more about that than a jack rabbit" is then credited as the truth and used as the basis for the argument that since Cox did not know of the reason, it could not rationally have been, as claimed, the decline in the Government headstone business. Similarly, the Board takes both sides of the question when, in Ferguson's case, it finds antiunion motive because the employer did not seek him out to rehire him a year later when Whitten quit. But, as to Hollinger, the Board, on the ground that it was self-serving, refuses to accept the rehiring of Hollinger in July 1953 when business increased as an affirmation of the October 1952 layoff being due to business decline only.

The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the ex-

---

Violation of this is itself an unfair labor practice, N. L. R. B. v. American Thread Co., 5 Cir., 210 F.2d 381.

12. Despite the efforts of General Counsel to create a picture of an integrated industrial operation with typical, sharply-defined job and departmental responsibilities, the total record leaves the clear imprint of a family enterprise grown from modest beginning into a sizeable business but still ruled and dominated by McGahey, Sr. Titles, organic responsibilities meant little: e. g., Cox, insisting that all just worked together and didn't take orders from anyone, said: "Q. Who is your boss? * * * A. The only boss I have is at home." Shelton, one whom General Counsel sought to clothe with managerial supervisory powers, described the informal flexibility of this enterprise by his own manifold duties: "Well, I have cut stone. I have removed rust spots from monuments, marble and granite. I have removed the grease and oil spots from marble and granite; cleaned out the drain ditch. * * * I have washed dogs, cooked barbecue, * * * and worked in the garden. I made sling shots and fixed guns. * * *."

planation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids. N. L. R. B. v. Nabors, supra; N. L. R. B. v. National Paper Co., supra; N. L. R. B. v. Blue Bell, Inc., supra; N. L. R. B. v. C. & J. Camp, Inc., supra.

Rotation in personnel is a common thing. The employer does not enter the fray with the burden of explanation. With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal—not a proper—motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one. N. L. R. B. v. Nabors, supra; N. L. R. B. v. National Paper Co., supra; N. L. R. B. v. Miami Coca-Cola Bottling Co., supra; N. L. R. B. v. Blue Bell, Inc., supra; N. L. R. B. v. Huber & Huber, supra; N. L. R. B. v. Houston Chronicle Publishing Co., supra, and see N. L. R. B. v. Coats & Clark, Inc. (Acworth Plant), supra, discussing these recent cases. This record falls far short of this mark. The holding of discriminatory discharge of Ferguson and Hollinger cannot stand.

The petition for enforcement must therefore be granted in part and denied in part.

Enforced in part.

Denied in part.