NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

L. C. FERGUSON and E. F. Von Seggern
d/b/a Shovel Supply Company,
Respondent.

No. 16973.

United States Court of Appeals
Fifth Circuit.

June 30, 1958.

Thomas J. McDermott, Associate Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

George E. Seay, Ralph W. Malone, Malone, Lipscomb & Seay, Dallas, Tex., for respondent.

Before TUTTLE, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is a Petition by the Board for enforcement of an Order, 118 N.L.R.B. No. 30, finding the Employer, Shovel Supply Company, guilty of 8(a) (1), 29 U.S.C.A. § 158(a) (1), violations and requiring the reinstatement of four out of seven persons, three of whom were subsequently rehired, found to have been unlawfully discharged under 8(a) (3) on April 26, 1956, for union activity.

The Employer is a partnership whose moving figure is L. C. Ferguson. His two sons, Lynn and Don, have supervisory roles. The general superintendent is Kuhn. The Company manufactures heavy steel road machinery, including, of importance here, heavy road rollers, described in terms of weight by tons, light and in ballast, as 2–3, 3–5, 5–8, 8–12 and 25 tons. The Company had nine departments of which three built the rollers, and a fourth was the machine shop. The machine shop related to all of the departments as it fabricated or assembled transmissions, gears, and the like for these machines. Each of the departments has a leadman who is substantially a straw boss and is responsible for supervision of the work but does much of the manual labor along with the other workers. We need not determine whether they were, as the Board found, supervisors. For in our approach we consider that which the Examiner credited them as saying, not as statements on behalf of management binding upon it, but only as that which management is supposed to have stated and which they, as would an ordinary witness, overheard.

At the outset we may dispose of the 8(a) (1) finding without much discussion. The Employer certainly does not concede defeat on this score, but with a realistic candor that reflects their competence and full understanding of the function of Board and Reviewing Court, counsel recognizes that there may well be substantial evidence to justify the Board's finding on this disputed matter. Especially would this be so since this is largely a determination of what was said or done with the law attaching many implications from the mere words used in contrast, say, to the 8(a) (3) situation where motive of discharge is such a subtle and elusive thing.

The complaint on 8(a) (1) is not confined to pre-April 26, 1956. It encompasses time both before and shortly after. The antiunion bias carrying, if believed, unmistakable overtones of a purpose to discriminate and retaliate because of union membership, was established by statements attributed to Kuhn and Don Ferguson who certainly spoke for management. Likewise, as an illustration, partner Ferguson told dischargee Neal when he sought and obtained re-

employment after stating that he did not belong to the union, that it was not his intention to permit a union, and "before he would have a union in there he would close it down." If the statements attributed by the witnesses to these three representatives of management, as well as others discussed in connection with 8(a) (3), were in fact made, they established without doubt that both in form and purpose their effect was to discourage and frustrate the statutory right of the employees freely to organize and bargain collectively. National Labor Relations Board v. McGahey, 5 Cir., 233 F.2d 406, 409, 410.

■ The question was not what such statements meant or implied. Their form and context was such that the law found an unlawful purpose in them. What was in issue was whether these words had been spoken. On that the case was the everyday common variety lawsuit in which one affirmed and one denied. A factual dispute was presented: who was telling the truth—the alleged declarer who denied he spoke the words, or the witness who swore he heard them said? For that function the Board has the statutory, sole responsibility. Fact-finding is neither our permissible right nor duty. Our function in assaying that sort of controversy is merely to determine whether there was substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. There was certainly that here.

■ Ordinarily the 8(a) (3) problem requires a detailed consideration of the merits as to each of the dischargees or related groups of them. We think, however, that in this case, if the general approach briefly indicated as to 8(a) (1) and that which we have many times [1] set forth for 8(a) (3) is kept in mind, the matter may be much simplified. In the usual case detailed facts must be discussed and analyzed to determine the purpose and motive of the employer in making the discharge. This is in partial recognition that seldom can such intent be established directly and that almost always must it be inferred from the total sum of the evidence.

But here, as with the case of the 8(a) (1) violations, if words attributed to those authorized to speak for management are credited as having been said, their form and content and context eliminate all doubt on motive.

A very brief summary will relate this approach to this record. On April 16, 1956, dischargee Ferguson, unhappy as were others with recent wage increases which they had hoped would be greater, contacted the union organizer for the Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO. A meeting was arranged for that evening at the nearby Four Brothers Cafe and attended by four of the complainants later discharged. While these men were talking at a table, Don Ferguson entered, spoke to the men, had coffee and left. None thought that Don Ferguson knew what they were doing, but as they were anxious to keep their union plans secret, they adjourned to a nearby parking lot where, during the next ten days or so, several further meetings were held. There was active, but discreetly concealed, solicitation which resulted in an unknown number of additional employees signing union cards. But it was not kept secret. For dischargee Gonzales testified that on April 23, his leadman told him that "one of the men that we trusted the most knew what was going on and was taking [partner] Ferguson all the information about the union, that * * * [Ferguson] knew the time of the meetings and who signed the cards." The leadman added that Ferguson had said that he had a list of 12 men who had signed the cards which included

1. National Labor Relations Board v. Fox Manufacturing Co., 5 Cir., 238 F.2d 211; National Labor Relations Board v. West Point Manufacturing Co., 5 Cir., 245 F. 2d 783; National Labor Relations Board v. Newton Co., 5 Cir., 236 F.2d 438; National Labor Relations Board v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567; National Labor Relations Board v. McGahey, 5 Cir., 233 F.2d 406.

Gonzales. The leadman even told Gonzales he had better start hunting for another job because he would get "run off" the next day. About noon April 26, dischargee Neal asked his leadman why he was eating his lunch by himself to which the leadman replied, "he was studying about that union deal." The leadman predicted that someone would be fired.

At that very time, at 12:30 noon, April 26, the union filed with the Board's Regional Office at nearby Fort Worth a petition for certification.[2]

That evening at regular quitting time, the seven dischargees, each of whom it turned out had signed union cards, found a final paycheck and a notice[3] in place of his punch-out timecard.

Standing thus, and apart from these statements made by leadmen whose authority to speak for management was at best dubious, there might well have been little to establish that the Employer knew of the union campaign or who the members or active participants were. It may be that, in the face of the Employer's strong showing, it would not have been sufficient to create an inference equally reasonable of unlawful motivation. National Labor Relations Board v. Fox Manufacturing Co., supra. Without a doubt the Employer made a persuasive showing that with the increasing shortage of steel of the types required for these road rollers, the shortage of other parts, principally those made of steel, production of units was so far off that management, after watching the situation for several months, concluded that eight persons should be discharged immediately and, in selecting those the most unsatisfactory employees from the four departments most affected by the steel shortage were chosen.

But the record did not stop there. Two of the dischargees, Maxwell and Neal, within the next few days had personal conversations with management which, if credited as occurring, spelled out the unlawful cause of these discharges. On April 27, Maxwell went back to the plant where he met Don Ferguson. Don remarked that he was sorry to see Maxwell go "But you know how the old man feels about the union." Neal returned a week or so later and was referred to partner Ferguson who criticized Neal for absenteeism due to excessive drinking. In the course of that conference, Neal, to Ferguson's question whether he belonged to a union, answered with a flat negative. Ferguson then told Neal that he did not intend to have a union come into his plant, and "before he would have a union in there he would close it down."

Even more important, and here decisive, was the conversation which Maxwell had with Superintendent Kuhn on the night the seven were discharged. To Maxwell's direct question why they were fired, Kuhn answered, "Well, Ray, I understand that Mr. Ferguson fired everybody that signed a union card—said he had a man at the Labor Temple giving him some information and that he was letting everybody go that had signed a union card * * *." Kuhn further told Maxwell "that he had suggested to Mr. Ferguson to keep [Maxwell] and one other man, * * * that it was going to put him in a bind, but Mr. Ferguson wouldn't hear to it, that he was letting them all go." In the course of the conversation, Kuhn added further evidence of 8(a) (1) violations. He said, "I believe I told you and everybody I hired that Mr. Ferguson didn't go for the union * * *" and that Mr. Ferguson had said "before he would go union he would close the gate and lock the trucks up and * * * go somewhere else and start over * * *."

---

2. There is no evidence that the Employer knew of this until the following day.

3. It was identical in each case and read:
"Due to curtailment of operations, we will not be able to use you after today.

Should we need you in the future, we will be glad to call you
"Thank you for your service.
"Yours very truly,
"L. C. Ferguson."

This evidence, credited by the Board, is in our judgment decisive. We cannot ignore it simply because Kuhn denied he said any such thing. Nor may it be brushed aside as counsel suggests because of its infirmities under the traditional technical rules of evidence. The Employer urges that this is not only hearsay, but hearsay confounded by rank conclusions. On the surface it may appear to be both. But the statute, 29 U.S.C.A. § 160(e), the Administrative Procedure Act, 5 U.S.C.A. § 1009, and the law require that the evidence be substantial on the record as a whole. When the whole is examined, it is plain that the words of Kuhn, if actually spoken, amounted to a statement by the responsible management on the important thing which had just happened earlier that day and why it had taken place.

For Kuhn to say that "I understand," was not the mere equivalent of a second-hand report of what partner Ferguson had said nor Kuhn's conclusion on why Ferguson had acted as he did. In the context of this record, it was a statement in more colloquial terms of what Kuhn himself knew firsthand. At least the trier of fact could so treat it for it was a part of the Employer's articulately-presented thesis on the hearing that the selection of the seven to be discharged was done only after a careful survey of the whole labor force. That was done by Kuhn himself in company with department leadmen who acquiesced in Kuhn's recommendation. In this Kuhn and Ferguson collaborated closely and on Kuhn's recommendations, Ferguson made the final choice.

Kuhn and Ferguson were each a part of management. Moreover, both had participated directly in management's decision on this very problem. What either said in this field would bind management. Why a thing is done, why one course rather than the other is taken is, of course, the end product of the process of business judgment. When responsible management describes the motive for an act, it becomes no less binding merely because expressed in words which suggest a conclusion or an inference.

The effect of this evidence was an admission, in the sense of a position contrary to that taken in the pending proceeding, Cox v. Esso Shipping Co., 5 Cir., 247 F.2d 629, that each and all had been fired for union membership. If Kuhn said what was said he said, it was, in this context, an outright confession of unlawful discrimination. It eliminated any question concerning the intrinsic merits as to each of the individual dischargees, the precise evidence showing management's knowledge that any or all were engaged in the union activity, or other causes suggested as the basis for the discharge.

The whole question then was whether he said what Maxwell said he said. That depended on who was telling the truth—Maxwell or Kuhn. The agency to resolve that issue was the Board, not this Court.

And, viewing this, as we must, in the context of the whole record, we cannot say that this piece of evidence, not intrinsically untrustworthy, is so destroyed by other facts or circumstances that it cannot be credited as crucial. Affirmatively, this evidence was consistent with that of a similar nature relating to 8(a) (1) which also came from top management. Negatively, the Employer's explanation for the discharges was not so overwhelming that it made this contrary evidence unacceptable as a matter of law. The fact of significant shortages in needed steel and the impact of that on productive capacity and, in turn, on the labor force, can be accepted. But as this condition had been going on since mid-1955, getting either worse or no better after the first of 1956, there are at least questions which arise. How did it happen to come when it did, in mid-week, not a regular payday? If it was thought wise to reduce labor costs, was it not somewhat strange that no others were subsequently laid off because of curtailed production despite even the subsequent nationwide steel strike on July 1, that no reduction was then made in the work

schedule of the plant of nine hours for five days and one-half day on Saturday, at least nine hours of which were thus on overtime? As with most of the seven laid off, no complaint had previously been made about the manner of performance of their work, was the explanation covering just why each of the seven was selected rather than others a convincing one? Was it pure coincidence that those selected included the four who held the first meeting at the cafe? Did this selection on the basis of comparative unfitness square with the expectant hope, note 3, supra, of future re-employment?

■ These and other questions are not to be understood as an intimation by us that we consider it was on the Employer to establish a good reason for the discharge, for the burden is clearly on the general counsel. National Labor Relations Board v. McGahey, supra. But insofar as the Employer's theory of motivation for discharge is put forward to persuade that the unlawful motive otherwise tentatively established by receivable evidence is not trustworthy, the force of such explanation may certainly be tested by the trier in the light of the unanswered as well as answered queries, the doubts as well as certainties. How much freer must it be from these unknowns when it is put forward to obliterate, as a matter of law, the contrary fact.

It is at this point where this case is so distinguishable from those, note 1, supra, in which we have held instances of 8(a) (3) charges not sustained. Almost uniformly the evidence in them established without contradiction the employee's inefficiency, breach of discipline, improper performance or work, violation of orders and thereby the existence of a good ground for discharge, and on the other hand, the inference of unlawful discharge came from more equivocal circumstances. Here it is more nearly the reverse. The Employer's explanation, persuasive and legally sufficient if credited, depends on manifold factors, many elusive and indefinable; in contrast, the

evidence of unlawful action, if credited, is direct and positive.

The case began and ended as a truth-finding task. As the evidence from the Employer is weighed in the scales of legal sufficiency against that supporting the charges, the conclusion that the discharges were for union activity was equally as likely as the contrary claim that it was from production falloff. In that stage of minimal equilibrium, determination of credibility, the weighing of the evidence for its intrinsic truth, became the responsibility of the Board whose resolution of the conflict is binding on Employer, Employee, Board and Court alike.

Petition for enforcement granted.