[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11791

_____

LHOIST NORTH AMERICA OF ALABAMA, LLC,

Petitioner-Cross Respondent,

*versus*

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL & SERVICE WORKERS LOCAL UNION 563 ("THE UNION"),

Intervenor.

———————————

Petition for Review of a Decision of the
National Labor Relations Board
Agency No. 10-CA-221731

———————————

Before JORDAN and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*] District Judge.

SCHLESINGER, District Judge:

This review involves a long-term, reliable employee—until the employee's union activities caught the ire of the company. The company targeted the employee until an excuse could be found to discipline and ultimately terminate his employment. This opportunity arrived the day the employee participated in a union phone call on company time.

Desilynn "Floyd" Avery, while on break, participated by phone call, as the acting union president, in another employee's termination hearing. Although the call lasted at least 25 minutes longer than Avery's break, he did not clock out for the extra time, or later report he had overstayed his break. Avery's employment was terminated. The question is whether the firing was

———————————

[*] The Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

appropriate. Following oral argument and a review of the record, we affirm the conclusion it was not.

## I

### A

Lhoist North America of Alabama, LLC ("the Company") operates two quarries and three lime manufacturing plants in Alabama that employ over 200 employees. At its Montevallo plant, in Calera, Alabama, it receives raw materials to produce lime and lime products and employs around 50 hourly employees, including Avery.

Since 1987, United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local 563 ("the Union") has represented a bargaining unit of production and maintenance employees at the Company's plants. In the fall of 2016, the parties began negotiations for a new collective-bargaining agreement to succeed the one due to expire in December. Senior Human Resources Manager Emily Berkes characterized the negotiations as "contentious" because the Company proposed changes to the agreement.

Following an impasse in bargaining, in October 2017, the Company unilaterally implemented new terms and conditions of employment. In 2017 and early 2018, the Union filed many charges with the National Labor Relations Board ("the Board"), some of which involved the unilateral implementation.

### B

Avery joined the Company in 1991. He was its sole slurry operator at the Montevallo plant; a job that entailed mixing hydrated lime and water, sampling it, and loading the finished product onto a truck. Slurry is usually mixed once or twice each week and the process takes around 4-6 hours.

Avery typically worked Monday through Friday on the day shift, from 6:00 a.m. until 2:30 p.m. Like other employees in the plant, he clocked in when arriving at work and clocked out if leaving the facility. His lunch was a non-paid 30-minute break automatically deducted from his pay. For a regular 8-hour shift, employees received a 15-minute paid break. Like other employees, and under the employee handbook, Avery did not clock out for lunch or any break unless he left the plant. His usual 15-minute morning break began around 9:00 a.m. and lasted until 9:15 a.m. The supervisors, whose offices are next to the break room, would normally take their breaks alongside the employees.

Besides his slurry operator obligations, Avery performed other duties outside of his job's requirements. Production Manager Grant McCallum characterized Avery as someone who "would typically help out . . . in other areas of the plant." Avery's help included regularly filling and driving a water truck used to spray the plant down to limit dust; a task not part of his job description. Avery also sometimes loaded bags with product and helped stack them in the bagging shed.

During the relevant time, Stacey Barry was the Company's Senior Human Resources Director while Emily Berkes was the

Senior Human Resources Manager. Terry Beam was Avery's direct supervisor and he reported to Production Manager Grant McCallum. Barry characterized Avery as an employee who "always worked" and was unaware of any complaints about his work performance. McCallum was unaware of any complaints about Avery's work the day of his discharge.

## C

Avery was a member of the Union for his entire employment, serving as Union Steward and then as vice-president since 2010. Avery was the acting president for part of 2018. In his role as vice-president, Avery attended all arbitrations. He also participated in the most recent, and prior, collective-bargaining negotiations. Avery was a vocal opponent of the implemented terms, according to Berkes. McCallum also considered Avery a strong employee advocate who often challenged management.

During work time, Avery, and Union president Jon Wilson received phone calls from Barry and Berkes to discuss union matters. Wilson and Avery were not given notice and did not notify their supervisor about the calls or have their time docked. The Company also called Avery and Wilson to represent employees in meetings on the "spur of the moment" without prior notification and without providing notice to their supervisors. Before his discharge, Avery was never disciplined for taking a cell phone call at work.

## D

On January 5, 2017, Avery received his first discipline; a final written warning for a no call, no show on January 3. The warning suggested a second no call, no show "may result in termination." The incident stemmed from Avery's confusion about his work schedule following a vacation. The Company issued the final warning despite the highest ranking official at the plant, Plant Manager Craig Gordinier, recommending the Company withhold Avery's pay for the New Year's holiday and charge him with one occurrence. Under the Company's attendance policy, a single occurrence does not result in any discipline.

The Company's attendance policy and its employee handbook address disciplinary action for a no call, no show differently. The attendance policy states:

> Not reporting to work or not calling to report the absence properly is considered No Call/No Show. The first instance of a no call/no show will result in a Final Written Warning. The second offense may result in termination of employment without additional interventions. Consistent with the Labor Agreement, Section 12.11(i), an employee who is absent from work without notification to the Company for 2 consecutive work days without excuse satisfactory to the Company will lose their Seniority Rights.

While the handbook provides, "[t]he first instance of a 'no call/no show' will typically result in a written/formal reminder. The second separate offense may result in progressive disciplinary action leading up to and including termination of employment."

The Company also has General Conduct and Safety Rules every employee must follow. These rules established a "Policy for Disciplinary Action" that provided, "[t]he records for disciplinary actions on an employee will be good for a period of one year. If the employee then passes a period of one year without further disciplinary problems, the record will be reduced so that the employee's next offense would be a written warning."

## E

More than a year later, Avery once again found the ire of the Company, but this time for his union activity. On January 22, 2018, Avery attended an offsite arbitration hearing in his capacity as union vice-president and acting president. Barry and Berkes were present at the arbitration, as the Company's representatives, and neither commented on Avery's presence. Nor did Beam contact Avery about his absence from the plant.

Avery did not notify Beam, his supervisor, that he was attending the arbitration and had never done so before. From his experience, the Company representatives advised Avery's supervisor he would attend the arbitration.

The next day, January 23, Avery's supervisor directed him to see Grant McCallum, the production manager. McCallum questioned Avery about his absence from work the previous day. At McCallum's request, Avery provided a handwritten statement explaining why he did not provide advance notice for the arbitration.

In this statement, Avery explained, "I was under the assumption that by me being the acting president of the Union that the

company would inform my supervisor and let him or her know that I would be excused from work. At least that's how it's been done in the past."

On January 26, Avery was called to another meeting about the arbitration, but this time Avery was joined by Barry, Berkes, McCallum, and a union steward. Barry explained the "higher-ups" wanted Avery discharged, but he did not. So McCallum presented Avery with a last chance agreement. Avery objected, asserting he had never provided notice to a supervisor before attending an arbitration. But Barry read Section 16.3 of the unilaterally implemented collective-bargaining agreement, which required union officials to give the Company a week's advance notice if they needed unpaid union leave to attend "third step grievance meetings, arbitration hearings, and labor negotiations" and "union conventions or meetings."[1]

Based on Barry's warning, a failure to sign the last-chance agreement would be considered a voluntarily resignation, so Avery signed. The agreement included a one-day suspension and required Avery to notify his supervisor of an absence at least one hour before the scheduled start time. It also stated that Section 16.3 of the implemented terms and conditions of employment required Avery "to provide the Company in writing a one (1) weeks' notice in

[1] Unlike under the expired collective-bargaining agreement, the Company had required advance notice only for union conventions or meetings, and it would notify employees' direct supervisors of planned attendance at meetings between the Company and the Union.

advance of the need for leave for union officials or other employees attending union conventions or meetings, including third step grievance meetings, arbitrations hearings and labor negotiations."

The agreement noted, "If you are required to be off on union business leave, as a union official you will agree to provide the Company one (1) weeks' notice in advance of your need for union leave in accordance with Article 16, section 16.3." By its terms, the agreement remained in effect for the next 12 months and provided that another "no show" or any violation of the Company's policies, rules, or regulations would result in termination. In response, the Union filed an unfair-labor-practice charge with the Board regarding the last-chance agreement.

## F

The matter reached a turning point less than six months later, on June 1, 2018. That morning Avery began his break at about 9:12 a.m. in the break room. At 9:21 a.m., while still on break, Avery received a call from a hearing officer with the Alabama Unemployment Office. To hear better, Avery stepped outside the break room. The unemployment hearing officer stated that he was calling Avery about a case involving a discharged coworker, Willie May, and asked whether Avery was "potentially going to be serving as a representative." Avery replied, "Yes." Avery also had a pending grievance regarding May's discharge, with a meeting scheduled for June 7.

After contacting Avery, the hearing officer brought the other parties onto the call and officially started the unemployment

hearing. He introduced the parties on the call as claimant May, his representative Union vice-president Avery, company representative Kellen Anderson, and company witness Barry. All the other participants, except Avery, called into the hearing.

Avery agreed to participate in the call, which he did not consider a personal call, because he believed he needed to cooperate with a governmental agency. He had not expected the call and received no earlier written notification from the unemployment office. Nor had Avery discussed with May being a witness or representative.

Avery's portion of the call lasted 31 minutes. During the call Avery walked to the water truck and stood outside it. The plant was already watered down, and the grounds were wet. During the call, no slurry was running, and Avery had no trucks to load. Avery's participation was limited to asking one question to Barry and making a statement on May's behalf. After the call, at 9:52 a.m., Avery retrieved diesel fuel from the maintenance shop, topped off the slurry machine, and resumed his work activities with the water truck.

Barry said nothing to Avery during the hearing and raised no concerns or objections to Avery's presence on the call. Avery did not report the time to anyone because he thought the call was work-related, particularly with Barry on the line, and because the Company knew he was on the call. Neither Joey Hemphill, acting as Avery's supervisor that day, nor any other supervisor said anything to Avery while he was on the call. Nor did anyone ask him

where he was after the call ended or object to management about Avery's work that day.

After the unemployment hearing call concluded, Barry notified Berkes that Avery was on the unemployment hearing call and asked her to investigate whether he was present at work that day. Human Resources directed McCallum, the plant manager, to speak with Avery about the call and determine whether Avery alerted anyone about it.

Four days later, on June 5, McCallum questioned Avery whether he let anyone know of his participation in the unemployment hearing. Avery showed his phone log to McCallum and explained the call was unexpected and came in during his break.

On June 6, in a follow up conversation, McCallum asked Avery to provide a written statement. The statement, submitted on June 7, at 7:30 a.m., detailed:

> On Friday June 1, 2018 while on my break I received a phone call at 9:21 a.m. from an Agent of the Unemployment Office. The call was in regards to Willie May filing for unemployment. The Agent said that [May] told him to call me. [The Agent] then told me that he had [May], Stacey Barry and someone else from the company . . . waiting to be conferenced in for a hearing on the matter of [May's] unemployment. I assumed that I was supposed to participate being that Human Resources was involved and that I was called. I've never been involved in this before.

Avery told McCallum he was willing to have his pay docked for the telephone call. McCallum had the power to change Avery's time but did not do so.

Around 9:00 a.m. on June 7, McCallum explained the Company had "looked over everything" and Avery was being suspended pending an investigation. Avery told McCallum he thought he was supposed to take the call and asked why he was being suspended. McCallum's response was Avery performed "[u]nion business on company time."

Later that morning, after Avery left the facility, Berkes called Avery and asked him to meet with her. At the meeting, with the Union president Wilson in attendance, Avery told Berkes he did not know about the call from the unemployment office in advance, he had received nothing in the mail about the hearing, the hearing officer called him, and he was not sure if he was May's representative at the hearing. He added May called him about 3 days before the hearing about the status of his pending termination grievance and his job search. Avery also provided Berkes with a screenshot of the phone call, which confirmed the unemployment office called him at 9:21 a.m. and the call lasted 31 minutes.

Avery asked Berkes what all the questionings were about. She suggested Avery had performed "[u]nion business on company time" when he participated in the phone call. Avery again explained he thought he was supposed to take the call, and suggested that if the concerns centered on his time, then his pay should be reduced. Berkes rejected Avery's suggestion, and countered that

Avery claimed the same lack of knowledge when confronted about the January 2018 arbitration.

On June 11, Berkes met with Avery and told him the Company terminated his employment. Avery was given a termination letter, which Berkes drafted. The letter referenced the last-chance agreement Avery signed and his awareness of the Company's policies in its handbook. The letter also specified:

> Based on our investigation, it appears that you failed to properly notify your leadership of your intentions of participating in an unemployment hearing call on June 1, 2018 while still on work time. You admitted that you never made an effort prior to or immediately after the call to notify your supervisor that you were on this call when you were supposed to be working.

> ★★★

> You claimed that you were not sure if you were called as a witness or a representative. However, our Investigation indicates that you were not sworn in as a witness, did not act as a witness, and instead acted as a representative for Willie May during the hearing.

> ★★★

You clearly had no intentions of ever notifying management about falsely reporting your time while getting paid for this time off the job.

The termination letter mentioned Avery acting as May's representative rather than a witness because, according to Berkes, as a representative "he should have requested time off as union business[,]" and he should have asked the hearing officer to wait until he obtained supervisory approval to continue on the call.

On November 20, 2018, the Company issued a memorandum entitled "Important Cellphone and Returning from Break Timely Memo." It stated:

In support of some recent labor charges, the Union has alleged that the Company does not uniformly enforce its guidelines and policies prohibiting the use of cellphones during working time and requiring employees to return to work from breaks in a timely manner. The Company wants to make sure everyone fully understands expectations related to cellphone use at the plants and the need to follow break policies. In addition, the Company wants to make sure these guidelines and policies are enforced in a consistent manner.

The memo provided guidelines explaining cell phones should be used only during scheduled work breaks in certain areas and that employees would face disciplinary action for failing to timely return to work after breaks.

Employees, including Wilson, continued to use their cell phones for personal use without receiving discipline.

## II

The Union filed with the Board unfair labor practice charges against the Company because it suspended and ultimately terminated Avery for engaging in protected activity, union activity, or both. After an investigation, the Board's General Counsel issued a consolidated complaint alleging the Company violated Section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by suspending and discharging Avery for engaging in union activity when he participated in an unemployment hearing on behalf of a discharged former coworker.

An administrative law judge ("ALJ") heard evidence on these charges and issued a decision finding the Company's actions were unlawful under both grounds alleged. The ALJ determined Avery's participation in the unemployment hearing was protected concerted activity and there was direct evidence Avery's employment was terminated because of his union activity. The ALJ also found circumstantial evidence of "unlawful animus" in the Company's investigation and shifting explanations for its adverse actions.

In reaching her decision, the ALJ explained, besides basing her credibility rulings on the observation of witness demeanor, she relied "on a variety of factors, including, but not limited to, the context of the witness testimony, the weight of the respective evidence, established or admitted facts, inherent probabilities, and

reasonable inferences that may be drawn from the record as a whole." The ALJ gave specific reasons for discrediting certain testimony, including the Company's repeated use of leading questions and its reliance on hearsay and contradictory statements and inconsistencies between witness testimony and the Company's own documents.

For example, in discrediting Barry, the ALJ found his testimony misleading, contrary to documentary evidence, and "externally inconsistent" with Berkes' admissions that she included certain statements in the discharge letter based on Avery's union activity. Similarly, in discrediting McCallum, the ALJ found his "testimony was frequently generalized and incorrect." But in crediting Avery's testimony that McCallum told him he was suspended for conducting union business, while discrediting McCallum's denial, the ALJ noted the latter's "weak" denial was "externally inconsistent with Berkes' admissions regarding the termination letter." Given Berkes' admissions about the termination letter, the ALJ found it "difficult to believe Berkes' testimony that the group meeting [to discuss Avery's status] did not consider Avery's role at the unemployment hearing."

On review, the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted the recommended Order with modifications. The Board agreed with the ALJ that the Company violated Sections 8(a)(3) and (1) of the Act by suspending and discharging Avery for engaging in union activity. But the Board passed on the ALJ's recommended finding of a Section 8(a)(1) violation for

the Company "suspending and discharging Avery for engaging in protected concerted activity and based upon an overbroad application of Sec. 16.3 of the collective-bargaining agreement."

The Board agreed with the ALJ "that Sec. 16.3 was inapplicable to Avery's cell phone participation in the hearing while at work, and that the Respondent's reliance on that provision and on an alleged cell phone policy that did not exist at the time of the events at issue was pretextual." The Board explicitly found:

> General Counsel met his initial burden of proving that the suspension and discharge were motivated by animus against Avery's union activity, we first note that Avery, the Charging Party Union's vice president, was engaged in union activity when he participated in the hearing, and that the Respondent knew as much because its director of human resources was also on the call. As further evidence of knowledge and direct evidence of animus, we rely on the statements by two of the Respondent's officials, Senior Human Resources Manager Emily Berkes and Production Manager Grant McCallum, that Avery was suspended and discharged for engaging in "union business." As the [ALJ] correctly stated, "[t]hese statements alone are 'independently sufficient to demonstrate unlawful discrimination,'" quoting from *Tito Contractors, Inc.,* 366 NLRB No. 47, slip op. at 5 (2018), enfd. 774 Fed. Appx. 4 (D.C. Cir. 2019). Although the [ALJ]

discussed several additional circumstantial evidence factors as further supporting an inference of unlawful antiunion motivation, we rely only on evidence of the Respondent's pretextual defenses and its disparate treatment of Avery, who was suspended and discharged for using his cell phone for doing "union business" on company time, whereas the Respondent generally permitted other employees to use their cell phones for personal calls on working time.

The Board rejected the Company's claimed defense that it would have discharged Avery because he did not explain to his supervisor the call and have his time corrected. Instead, the Board concluded the Company "generally permitted employees to take personal calls on working time, and it did not show that it has required other employees to notify their supervisor or correct their time record after doing so." As support for this finding, the Board accepted that the Company discharged "one temporary employee for multiple instances of using a cell phone on working time, but it introduced no evidence that it has ever discharged anyone for a single instance—except Avery, who was suspended and discharged expressly for using a cell phone to do 'union business.'"

The Board's Order required the Company to cease and desist from the unfair labor practices, and in any like or related manner interfering with, restraining, or coercing employees in the exercise of their statutory rights.

Affirmatively, the Order directed the Company to offer Avery reinstatement and make him whole for any loss of earnings because of his unlawful discharge, including by reimbursing his search-for-work and interim employment expenses. The Order also required the Company to post a remedial notice.

## III

We affirm the Board's Order when "its findings with respect to questions of fact are supported by substantial evidence on the record considered as a whole." *NLRB. v. Gimrock Const., Inc.*, 247 F.3d 1307, 1309 (11th Cir. 2001) (citing 29 U.S.C. § 160(e)). But "[s]ubstantial evidence is more than a mere scintilla of evidence," instead it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Allied Med. Transp., Inc.*, 805 F.3d 1000, 1005 (11th Cir. 2015) (quoting *NLRB v. Contemp. Cars, Inc.*, 667 F.3d 1364, 1370 (11th Cir. 2012)). *See also Northport Health Servs., Inc. v. NLRB*, 961 F.2d 1547, 1550 (11th Cir. 1992) (stating that we will not simply "rubber stamp" the Board's Order). When reviewing a conclusion by the Board that a "discriminatory motive" existed, we "are even more deferential" since "most evidence of motive is circumstantial." *NLRB v. Goya Foods of Fla.*, 525 F.3d 1117, 1126 (11th Cir. 2008) (quoting *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000)).

As for an ALJ's credibility determinations, "[a]s a general rule courts are bound by the credibility choices of the ALJ, even if they 'might have made different findings had the matter been before [them] . . . *de novo*.'" *Goya Foods of Fla.*, 525 F.3d at 1126

(quoting *Ona Corp. v. NLRB*, 729 F.2d 713, 719 (11th Cir.1984)). But a credibility finding "will not bind the Court when they are inherently unreasonable or self-contradictory or when they are based on an inadequate reason, or no reason at all." *Id.* (internal citations and quotations omitted).

## IV

In its petition for review, the Company raises four challenges to the Board's Order. First, the Company contends the Board's Order is flawed because the ALJ misunderstood or misapplied the law, the testimony, and the evidence. Second, the Company argues the Board misapplied the *Wright Line* analysis. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, 1088-89 (1980), enforced on other grounds, 662 F.2d 889 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982). Third, the Company alleges the Board misapplied the second stage of the *Wright Line* analysis because it simply concluded, with no analysis, the Company did not reasonably believe Avery engaged in misconduct and its decision was not based on Company policy and practice. And fourth, the Company claims the Board failed to analyze whether its finding of pretext supported a finding of unlawful discrimination.

The Company's contentions can be summed up this way—the Board misunderstood the facts and misapplied the law. After a careful review of the record, however, we conclude the Board's finding that Avery's discharge was motivated by anti-union animus is well supported by substantial evidence in the record.

## A

The National Labor Relations Act prohibits terminating or otherwise disciplining an employee because of union activity. 29 U.S.C. §§157, 158(a)(l). But "employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983), *abrogated on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276-77 (1994).

This case centers on whether the Company had a lawful motive when it discharged Avery for his participation in the unemployment hearing. The Company insists it did. It had every right to discharge Avery, the Company suggests, because he significantly exceeded his break time, did not inform his supervisor, and did not correct his time record.

In mixed-motive situations for both protected concerted activity cases under Section 8(a)(1) and those arising from possible antiunion animus under Section 8(a)(3), the Board applies the *Wright Line* burden shifting test. *Wright Line*, 251 NLRB at 1089. This test allows us to "to determine whether an employer violated the Act . . . ." *Ridgewood Health Care Ctr., Inc. v. Nat'l Lab. Rels. Bd.*, 8 F.4th 1263, 1279 (11th Cir. 2021). The first step requires the Board to "show by a preponderance of the evidence that a protected activity was a motivating factor in the employer's [adverse] decision." *Id.* (alteration in original) (quoting *Northport Health Servs., Inc. v. NLRB*, 961 F.2d 1547, 1550 (11th Cir. 1992)). The second step asks whether "the employer can show as an affirmative defense that it would have discharged the employee for a legitimate reason

regardless of the protected activity." *Northport Health Servs., Inc. v. N.L.R.B.*, 961 F.2d 1547, 1550 (11th Cir. 1992) (quoting *NLRB v. United Sanitation Serv.*, 737 F.2d 936, 939 (11th Cir. 1984)). Last, "the Board 'may then offer evidence that the employer's proffered 'legitimate' explanation is pretextual.'" *Ridgewood Health*, 8 F.4th at 1279 (quoting *Northport Health Servs., Inc.*, 961 F.2d at 1550).

As for motive, this "is a question of fact, and the Board may rely upon direct and circumstantial evidence to infer anti-union motive." *Ridgewood Health*, 8 F.4th at 1279 (quoting *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1424 (11th Cir. 1998)). Courts recognize the unique nature of direct evidence of unlawful motivation and have treated it as "especially persuasive." *See Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 297 (6th Cir. 1985) (explaining "where an employer's representatives have announced an intent to discharge or otherwise retaliate against an employee for engaging in protected activity, the Board has before it especially persuasive evidence that a subsequent discharge of the employee is unlawfully motivated."). Our sister court suggests when an employer admits an employee's union activity played a part in its decision, the admission serves to "eliminate[] any question" about its reason for the adverse action or "other causes suggested as the basis for the discharge." *L'Eggs Prods., Inc. v. NLRB*, 619 F.2d 1337, 1343 (9th Cir. 1980) (quoting *NLRB v. Ferguson*, 257 F.2d 88, 92 (5th Cir. 1958)).

The Board's finding that Avery's discharge was motivated by anti-union animus is a question of fact. We find substantial evidence supports the Board's conclusion that the Company violated

the Act when it suspended and then discharged Avery for engaging in union activity.[2]

The Board properly relied on the "direct evidence of animus" consisting of statements by Berkes and McCallum—the Company's representatives—that Avery was disciplined for engaging in union business. McCallum told Avery he was being suspended "due to his union activity." Berkes' termination letter to Avery also included statements reasonably construed to demonstrate Avery's union activity was the reason for his discipline. These admissions were sufficient for the Board to reasonably infer Avery's union activities were the essence of his suspension and discharge. We agree. These admissions from corporate

---

[2] As an initial matter, the first step of the *Wright Line* factors requires that the terminated employee have engaged in protected concerted activity. Union activities are protected activities. Section 8(a)(3) of the National Labor Relations Act prohibits employer "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). "An employer violates [that section] by taking adverse employment action or changing the terms or conditions of employment in retaliation for the union activities of its employees." *Allied Med. Transp.*, 805 F.3d at 1007. The Company contends that the Board erred in concluding that Avery engaged in protected concerted activity by participating in the unemployment compensation hearings during work hours. But the Board contends that Avery's participation in the unemployment hearing was union activity. We conclude that there is substantial evidence on the record to support the Board's finding that Avery was engaged in union activities, even if the unemployment call occurred during work hours.

representatives are clear indications of the true motivations implicated in Avery's discharge. *See L'Eggs Prods., Inc.*, 619 F.2d at 1343.

Substantial circumstantial evidence also supports the Board's finding that the Company was motivated to discharge Avery because of his union activities. Avery's discipline came despite other instances when the Company's representatives contacted Avery, and the union president, about union business yet without objection or having to account for his time. This is the essence of conducting union business on company time, and without advance notice—the suggested motivation for Avery's discipline.

Indeed, Avery was also treated more harshly compared to other employees who used cell phones on company time; despite the Company's lack of a written policy covering cell phone use at work. The sole instance the Company ever disciplined another employee for cell phone use stands unlike Avery's telephonic participation in the unemployment hearing. In the other situation, the Company sent a temporary employee back to the employment service, but only after what McCallum characterized as "multiple offenses" during work time for being on his cell phone and not performing work, including sitting down in the bagging section and "surfing the web." Significantly, the Company gave the temporary employee multiple chances to correct his conduct. Yet Avery was given no leniency. Avery was suspended and discharged for his first offense.

The Board also reasonably relied on a lack of evidence of the Company's proffered motives for firing Avery. There was no

evidence the Company ever terminated an employee for falsifying records. To the contrary, the Company threatened other employees with discharge for violations, like falsely entering truck weights to appear to be within the legal limits, but did not discharge them. The Company provided no examples of discharging employees for falsification of records in its Alabama facilities—even when one employee falsified records a second time.

We find substantial evidence supports the Board's conclusion that anti-union animus was the Company's underlying motive to suspend and discharge Avery for engaging in union activity. *See Ridgewood Health Care Ctr., Inc.*, 8 F.4th at 1279.

The Board also concluded the Company's justifications for its actions were pretextual and need not be accepted. *See Justak Bros. & Co. v. NLRB*, 664 F.2d 1074, 1077 (7th Cir. 1981) (quoting *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965)) (suggesting the company's "explanation need not be accepted if there is a reasonable basis for believing it 'furnished the excuse rather than the reason' (an employer's) retaliatory action."). This conclusion is amply supported by the record.

After careful review of the record, we likewise conclude substantial evidence, both direct and circumstantial, supports the Board's finding that Avery's discharge was motivated by unlawful, anti-union animus, the Board reasonably rejected the Company's affirmative defenses, and the Company's attempts to justify its actions were pretext. *See Northport Health Servs., Inc.*, 961 F.2d at 1550; *Ridgewood Health*, 8 F.4th at 1279.

The Company also faults the ALJ's creditably findings. We disagree. The ALJ carefully explained her credibility rulings were based on: the observation of witness demeanor; the context of the witness testimony; conflicts in the testimony; the weight of the evidence; and reasonable inferences drawn from the record. The ALJ's and the Board's credibility determinations were not "'inherently unreasonable,' 'self-contradictory,' or 'based on an inadequate reason,'" so we are bound by their credibility choices. *Allied Med. Transp.*, 805 F.3d at 1005 (quoting *Goya Foods of Fla.*, 525 F.3d at 1126).

We now pivot to the Company's insistence that the Board misunderstood the *Wright Line* test. These arguments are misplaced. The Board applied the proper legal standards, and its decision is supported by substantial evidence—direct and circumstantial. We affirm the Board's ruling that the Company violated Section 8(a)(1) of the NLRA by discharging Avery.

## IV

For all these reasons, we **DENY** the Company's petition and **GRANT** the Board's cross-petition for enforcement of the Order in full.