[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11615

_____

Agency No. 10CA113669 - 10CA136190

RIDGEWOOD HEALTH CARE CENTER, INC.,
RIDGEWOOD HEALTH SERVICES, INC.,

Petitioners-Cross Respondents,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner,

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL &
SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLA,

Intervenor.

_____

Petitions for Review of a Decision of the
National Labor Relations Board

_____

(August 13, 2021)

Before NEWSOM and BRANCH, Circuit Judges, and BAKER,* District Judge.

BRANCH, Circuit Judge:

Ridgewood Health Care Center, Inc. and Ridgewood Services, Inc. (collectively, "Ridgewood") petition for review of an order of the National Labor Relations Board ("Board"), which found that Ridgewood committed several unfair labor practices, in violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("Act"). Specifically, the Board concluded that Ridgewood violated the Act by: (1) coercively interrogating employees about union membership during job interviews, (2) notifying employees that they were not represented by a predecessor union, (3) threatening to fire an employee if she engaged in union activity, (4) using a discriminatory hiring scheme to avoid hiring a majority of the predecessor company's employees to evade bargaining obligations with the union, (5) refusing to recognize and bargain with the union, and (6) refusing the union's requests for information for purposes of bargaining. On petition for review, Ridgewood challenges each of these conclusions except the determination that one of its employees threatened to fire an employee for engaging in union activity. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union ("Union") intervenes in support of the

---

* Honorable R. Stan Baker, United States District Judge for the Southern District of Georgia, sitting by designation.

order, and the NLRB, through its General Counsel,[1] petitions for enforcement of the order. After careful consideration, and with the benefit of oral argument, we grant Ridgewood's petition in full and enforce the Board's order in part.

## I. BACKGROUND

A.    The Formation of Ridgewood

Since 1977, Ridgewood has owned a nursing home facility in Jasper, Alabama.[2] Beginning in 2002, Ridgewood leased its facility to Preferred Health Holdings II, LLC ("Preferred"). Preferred handled all operations at the Ridgewood facility, including hiring, managing staff, and negotiating with Ridgewood's union. Ridgewood's only involvement was collecting lease payments from Preferred.

In 2008, Joette Kelley Brown purchased Ridgewood and Ridgeview (another nursing home facility in Jasper, Alabama).[3] At the time Brown purchased Ridgewood, the Union was the exclusive bargaining representative of Preferred employees.

In 2012, Preferred sought to negotiate reduced lease payments, but Brown and Ridgewood could not agree to a reduction. The parties' relationship eventually

---

[1] In this appeal, we will distinguish between the order of the "Board" and arguments made in support of that order by the "General Counsel."

[2] For background purposes, we will refer to three entities that played a role in this case: (1) Ridgeview Health Care Center, Inc. ("Ridgeview"); (2) Ridgewood Health Care Center, Inc. ("Ridgewood"); and (3) Ridgewood Services, Inc. ("Ridgewood Services").

[3] Brown owned 100% of Ridgewood after she purchased the company in 2008. In October 2013, Brown's sister, Alicia Stewart, obtained a 10% share of ownership in Ridgewood.

deteriorated, and they agreed that Preferred's lease would terminate early on September 30, 2013. As a result, Preferred employees were notified on July 29, 2013, that their positions would be terminated at the end of September 2013.

Brown then formed Ridgewood Services in July 2013 to assume the operation and control of the Ridgewood facility beginning on October 1, 2013.

B.     Ridgewood's Recruitment Efforts

Because Brown wished to recruit Preferred employees to staff Ridgewood Services, Brown met with Preferred employees on several occasions that summer. In July, Brown met some of the Preferred employees and encouraged them to apply to Ridgewood Services. Brown explained to the Preferred employees that while all Preferred employees would have to "go through the application process, . . . [Brown] was expecting to rehire potentially everybody" or "99.9 percent" of Preferred employees. When asked whether Preferred employees who had been terminated from Ridgeview would be eligible to apply to Ridgewood Services, Brown stated that they would be considered. And in response to a question about the Union, Brown stated that she would have to recognize it and noted the Ridgeview facility had a "good relationship" with its union. At another meeting in August, however, Brown said that Ridgewood would not need a union because she and the Ridgeview union worked well together and ironed out their differences informally. Brown also introduced a new job classification at Ridgewood

4

Services: "helping hands." Brown utilized "helping hands" at the Ridgeview facility for about seven to eight years. "Helping hands" performed most of the same functions as certified nursing assistants ("CNA") but lacked formal certification. Finally, at a smaller meeting with four or five Preferred employees, Brown represented that employees who had been fired from Ridgewood would be eligible to apply to Ridgewood Services.

In mid-August 2013, Ridgewood Services offered Preferred employees an opportunity to apply for positions at Ridgewood during an exclusive three-week period that would end on August 30, 2013. Preferred posted a notice to its employees about the exclusive application period, and Ridgewood Services representatives met with Preferred employees to explain the application process. Ridgewood Services extended the application period by approximately one week (into early September 2013) before accepting applications from non-Preferred employees.

During a "very busy" and "chaotic" hiring process, 65 out of 83 Preferred employees applied and were interviewed. Typically, interviews were conducted by a group of two or three senior officials that included Brown, Stewart (Ridgewood's Vice President and Secretary), Vicky Burrell (Ridgeview's director of nursing), Kara Holland (Ridgeview's administrator), and SuLeigh Warren (Ridgeview's human resources director). Generally, applicants were asked about their

5

experience working for Preferred and whether they had suggestions for improvement. Four applicants were asked about their wages, benefits, and paycheck deductions (which might have included deductions for Union dues). And four applicants—Stephanie Eaton, Pam McPherson, Paul Borden, and Audrie Borden—were asked whether they belonged to the Union. Two additional applicants—Crystal Wilbert and Becky Ramos—volunteered during their interviews that they belonged to the Union.

Brown offered employment to 53 of the 64 Preferred applicants.[4] Two Preferred employees declined the offer. Rejection letters sent to Preferred applicants did not state a reason for the adverse decision. None of the interviewees who were questioned about Union membership were refused employment. Relevant here, Brown did not offer employment to four Preferred employees: Betty Davis, Gina Eads, Connie Sickles, and Vegas Wilson. According to Brown, Davis, Eads, and Sickles were not eligible to be hired at Ridgewood because they had been fired at Ridgeview.[5] At Ridgeview, Brown had a policy of not rehiring employees who had been terminated from that facility, and Brown claimed to have implemented that same rule during the Ridgewood Services hiring process. Eads

---

[4] Although Brown consulted with other members of the interviewing committee, Brown made the hiring decisions at Ridgewood.

[5] The personnel files for Davis, Eads, and Sickles from Ridgeview indicated that they were not eligible for rehire at Ridgeview.

6

was aware of Ridgeview's policy and, during her interview with Burrell and Holland, asked whether the "no-rehire" policy would be applied to her. Burrell and Holland assured Eads that she "had nothing to worry about."[6] Wilson was not hired because, after her interview, Ridgewood Service's director of nursing, Sheila Cooper, told Brown that Wilson had been fired from another nursing facility after an altercation with a coworker.

After the exclusive application period for Preferred employees ended in early September, Ridgewood Services received 111 applications from non-Preferred employees. Ridgewood Services hired 56 of those applicants.

Of the 107 total employees hired by Ridgewood, 101 accepted their offers and reported for work on October 1, 2013—the day Ridgewood assumed operations from Preferred. And of the 101 employees who reported for work, 49 were former Preferred employees,[7] and 52 had never worked for Preferred.[8] In short, on the first day of operations, former Preferred employees did not comprise a majority of the new workforce at Ridgewood.

C.   Dispute Concerning Successorship and Ridgewood's Refusal to Bargain

---

[6] The no-rehire policy did not come up at any other interviews or appear in any interview notes.

[7] Two Preferred employees who were hired by Ridgewood did not show up for work.

[8] Ridgewood also hired 19 employees as "helping hands," and none of them had ever worked for Preferred.

As the hiring process unfolded, Ridgewood and the Union disputed whether Ridgewood was required to honor the collective bargaining agreement ("CBA") between Preferred and the Union. On July 15, Ridgewood's attorney told the Union that Ridgewood "reject[ed] the current [CBA]" but "nonetheless desire[d] to engage in bargaining" to negotiate a new CBA.

On September 10, the Union responded that "the CBA [between Preferred and the Union] remains in full effect, and that any attempt to reject the CBA by Ridgewood or its alter ego [Ridgewood Services] . . . is both unlawful and ineffective." It also formally requested that Ridgewood bargain with the Union. Three days later, the Union sought from Ridgewood "as part of its obligation to bargain under the National Labor Relations Act . . . a full account of [Ridgewood Services's] plans" regarding the upcoming transition. The Union requested specific information, including: job titles and classifications of affected Preferred employees, the benefits Ridgewood Services expected to provide affected Preferred employees, hiring standards, the number of employees to be hired, any changes related to terms and conditions of employment, and other documents pertaining to the relationship between Ridgewood and Ridgewood Services.

On September 23, Ridgewood attempted to "clear up" what it perceived as "confusion regarding upcoming changes at the Ridgewood facility." Ridgewood took the position that it was a separate entity from Preferred with no common

ownership and that it never had "any control over the day to day operations of the [Ridgewood] facility" or "any involvement in the employment of the workforce" prior to the planned transition. Thus, Ridgewood believed that bargaining was "premature" because Ridgewood Services could not "yet determine whether or not it will be a successor" employer until after hiring had been completed. In short, Ridgewood maintained that it was not bound by the CBA.

On September 25, the Union again disputed Ridgewood's claim that it was not bound by the CBA. The Union contended that because Ridgewood Services "share[d] common ownership, common management, and common legal counsel with Ridgewood Health Care Center, Inc., among other commonalities," it was the "alter ego" of Ridgewood and, therefore, bound by the CBA. The Union maintained that on October 1, Ridgewood Services would "stand as a successor in employment to Preferred." Additionally, the Union asserted that former Preferred employees "comprised . . . a majority of employees who were previously part of the [Union] bargaining group." Finally, the Union again requested information for purposes of bargaining, including details about Preferred employees who were offered or denied a job by Ridgewood Services and the terms, conditions, and benefits of employment.

On September 30, Ridgewood again rejected the Union's position. Ridgewood noted that, although its name appeared in the CBA, the "inclusion of

[Ridgewood's name] in the CBA was never authorized by [Ridgewood]." And Ridgewood emphasized that "[f]or ten years, the [Union] has dealt exclusively with Preferred in regards to the CBA." Thus, Ridgewood observed that "[i]t is clear that the [Union] is very aware that Preferred is the correct party to the CBA" and that the Union "does not allege that [Ridgewood] is the alter ego of Preferred." Ridgewood also noted that it was premature to bargain before the conclusion of the hiring process.

D.    Ridgewood's Assumption of Operations

As planned, Ridgewood Services assumed operational control of the Ridgewood facility from Preferred on October 1. That same day, the Union asked Ridgewood Services to "recognize it as the exclusive representative of those employees who are employed within the jobs covered by the CBA." The Union asserted that the majority of employees were covered by the CBA and, once again, requested information for bargaining purposes.

On October 7, Ridgewood Services rejected the Union's contentions and represented that it "still is actively filling positions and anticipates hiring many more employees in the near future." In addition, Ridgewood Services noted that:

> [E]ven if it was assumed that the Company had hired a substantial and representative complement of its workforce by the first day of operations as you assert, the majority of employees hired in job positions that were in the bargaining unit represented by the [Union] were not previously employed by Preferred. Therefore, even if a substantial and representative complement had been hired, Ridgewood

10

Services . . . would not be a successor and will not and indeed cannot recognize the [Union] as the representative of those employees. Likewise, it has no obligation to respond to your requests for documents.

In the six weeks that followed Ridgewood's October 1, 2013 assumption of operations, Ridgewood Services hired 22 additional, non-Preferred employees for positions that were part of the bargaining unit under the CBA.

E.      Ridgewood after the Transition

On October 22, Brown sent a letter to each employee reaffirming her position that Ridgewood Services was a non-union facility.  The letter also addressed union activity so that each employee "[could] make an informed decision."  Brown stated that a union was "unnecessary at our facility" because "managers and employees . . . are working together well to move this facility forward."  She expressed a "vision" that Ridgewood Services could be a great place for employees and residents and that vision could be "best accomplish[ed] . . . without a union."  Brown continued:

> I want to address union cards because asking employees to sign union cards is often how a union initiates the process of making the facility unionized.  A union card is a legal document that gives the union the right to be your exclusive representative.  Once you sign a card the union does not have to give it back to you even if you change your mind.  In my mind, it is like giving a "blank check" to a stranger as you have no guarantees of what will happen if you sign a card.
>
> A union card does not guarantee that employees will be able to vote for whether they want a union.  If the [Union] gets a majority of our employees to sign these cards, it can ask the federal government to

11

force the union into Ridgewood without any election at all.  In some cases employees get a vote to decide whether to bring in a union, but in other cases the unions have used the signed cards alone to attempt to represent the employees of the facility.  If a majority of the employees support the union, the union will represent all of the employees in the bargaining unit, including the ones that did not want them in the facility.

As you can see, signing a union card is a serious matter.  It is your choice whether to sign a card.  No one should pressure you to sign a card.  If you are ever asked to sign a union card, I urge you to ask questions and get all the facts before deciding whether to sign.  I believe you deserve to be fully informed of what can happen if you sign a card.

In January 2014, Brown again addressed a potential union during a small meeting with Ridgewood Services employees.  One employee asked Brown whether a rumor was true—that Ridgewood Services would close if a union was formed.  Brown responded that it was "a possibility."

That same month, Ridgewood Services' then-director of nursing, Sheila Cooper, threatened to fire Caitlin Bolinger if it turned out to be true that Bolinger was "talking about being in the Union and trying to get other CNAs into the Union."  Later that month, Bolinger was fired.

F.    Procedural History

On September 19, 2013, after Brown told Preferred employees that she did not think a union was necessary at Ridgewood Services, the Union filed a charge with the Board alleging unfair labor practices.  The charge alleged that

Ridgewood[9] refused to bargain with the Union, in violation of 29 U.S.C. § 158(a)(5).[10]  The Union later amended its charge to include allegations that Ridgewood: "scheme[d] to create a workforce composed of less than a majority of the predecessor's employees in order to avoid having to recognize the Union" and coercively "interrogated job applicants during job interviews about their union membership and union activities," in violation of 29 U.S.C. § 158(a)(1)[11]; and "refused to hire [Preferred] employees . . . because of their union and protected activities in an attempt to avoid a bargaining obligation with the union," in violation of 29 U.S.C. § 158(a)(3).[12]

On August 28, 2014, the regional director for the Board filed a complaint against Ridgewood under 29 U.S.C. § 160(b)[13] and scheduled a hearing for October.  Shortly thereafter, the Union filed another charge (later amended twice) against Ridgewood, alleging that Ridgewood—without bargaining with the

---

[9] Unless otherwise noted, we will refer now to both the Ridgewood entities collectively as "Ridgewood."

[10] The Act provides that "[i]t shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5).

[11] It is an unfair labor practice under the Act "to interfere with, restrain, or coerce employees in the exercise of [collective bargaining] rights."  29 U.S.C. § 158(a)(1).

[12] It is an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3).

[13] When the Board receives a charge "that any person has engaged in or is engaging in any . . . unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes" may serve a complaint on the charged party and hold a hearing.  29 U.S.C. § 160(b).

Union—unilaterally disciplined and terminated several employees, including

Bolinger, in violation of 29 U.S.C. § 158(a)(5).

An administrative law judge ("ALJ") held a three-day hearing, during which

24 witnesses testified.  In a written decision, the ALJ determined that Ridgewood

committed several unfair labor practices.  First, the ALJ held that Ridgewood was

a successor employer that was obligated to bargain with the Union under *National*

*Labor Relations Board v. Burns International Security Services, Inc.*, 406 U.S. 272

(1972).  Thus, the ALJ held that Ridgewood violated § 158(a)(1) and (5) by

refusing to bargain with the Union, unilaterally changing terms of employment,

and refusing to provide the Union with information that it had requested.  Second,

the ALJ held that Ridgewood violated § 158(a)(1) by interrogating job applicants

about their union status, informing Preferred employees that Ridgewood would not

recognize the Union, and threatening to terminate Bolinger if she engaged in union

activity.  Third, the ALJ held that Ridgewood violated § 158(a)(1) and (3) by

engaging in a discriminatory hiring scheme to avoid bargaining obligations by

(1) creating a new "helping hands" bargaining classification to avoid hiring a

majority of Union employees and (2) refusing to hire four Union members: Davis,

Eads, Sickles, and Wilson.  Fourth, the ALJ held that Ridgewood violated

§ 158(a)(1) and (5) by disciplining and discharging three employees, including

14

Bolinger, without notifying or bargaining with the Union.[14]  Ridgewood filed

exceptions to the ALJ's decision before the Board, and the General Counsel filed

its responses to those exceptions.

The Board affirmed the ALJ's decision.  *First*, applying the burden-shifting

test established in *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083

(1980), the Board agreed that Ridgewood's refusal to hire Davis, Eads, Sickles,

and Wilson was motivated by anti-union animus and was therefore discriminatory,

in violation of § 158(a)(1).  The Board's determination rested on three findings that

purportedly demonstrated anti-union animus: (1) Ridgewood "coercively

interrogat[ed] Preferred employee applicants regarding their union membership

during job interviews" (an independent violation of § 158(a)(1)); (2) Brown stated

that she might close the Ridgewood facility if its employees unionized; and

(3) Cooper threatened to terminate Bolinger if she had been involved in union

recruitment (also an independent violation of § 158(a)(1)).  The Board then

rejected Ridgewood's affirmative defense—that the four individuals were

ineligible for employment due to Brown's "no re-hire" rule—as pretextual.

---

[14] Shortly after the Board's regional director filed her complaint, she filed a petition for an injunction to prevent the alleged unfair labor practices under 29 U.S.C. § 160(j) in the United States District Court for the Northern District of Alabama.  *See Harrell v. Ridgewood Health Care Ctr., Inc.*, 154 F. Supp. 3d 1258 (N.D. Ala. 2015).  That provision authorizes the Board "to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order."  29 U.S.C. § 160(j).  The district court denied injunctive relief shortly after the ALJ's decision issued.  154 F. Supp. 3d at 1260.

*Second*, the Board agreed that Ridgewood was a *Burns* successor to Preferred and, therefore, was obligated to bargain with the Union under § 158(a)(5). The Board held that the *Burns* test was satisfied because (1) there was a substantial continuity of business operations between Preferred and Ridgewood, and (2) there was a continuity in the workforce—a majority of the new employees would have been former employees of Preferred but for Ridgewood's discriminatory refusal to hire Davis, Eads, Sickles. On October 1, Ridgewood had hired 101 employees (49 former Preferred employees and 52 new employees). The Board reasoned that absent discrimination, Davis, Eads, and Sickles would have been hired, and would have replaced three non-Preferred employees.[15] Thus, this one-in-and-one-out theory would have yielded a majority of former Preferred employees (52 to 49) and triggered Ridgewood's obligation to bargain with the Union as a *Burns* successor.[16]

*Third*, and relatedly, because the Board agreed that Ridgewood was a *Burns* successor to Preferred, it found that Ridgewood had an obligation to provide the Union with the information it had requested and should not have notified Preferred employees that they were not represented by the Union.

---

[15] The Board omitted Wilson from its calculation because she was unavailable to start work on October 1.

[16] Because the Board found that Ridgewood was a *Burns* successor, it found "no need to pass" on the ALJ's determination that the 19 "helping hands" employees should have been included as part of the bargaining unit.

16

Accordingly, the Board concluded that Ridgewood: (1) violated § 158(a)(1) by interrogating job applicants about union membership, notifying employees in writing that they were no longer represented by the Union, and threatening to fire Bolinger if she engaged in Union activity; (2) violated § 158(a)(1) and (3) by refusing to hire Davis, Eads, Sickles, and Wilson in order to avoid its bargaining obligation with the union; and (3) violated § 158(a)(1) and (5) by refusing to bargain with the Union and provide the information it had requested.

These cross-petitions for review and enforcement followed.

## II. STANDARD OF REVIEW

We review the Board's legal conclusions *de novo* and its findings of fact for substantial evidence. *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1134 (11th Cir. 2016). "We will enforce an order of the Board if its factual findings are supported by substantial evidence on the record considered as a whole." *NLRB v. Allied Med. Transp., Inc.*, 805 F.3d 1000, 1005 (11th Cir. 2015) (citation and quotation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Northport Health Servs. v. NLRB*, 961 F.2d 1547, 1550 (11th Cir. 1992) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). "Our standard of review does not change when the Board reaches a conclusion different from that of the administrative law judge, . . . but the administrative law judge's conclusions are

17

one factor to be considered in determining whether [the substantial evidence] standard has been satisfied." *Allied Med. Transp., Inc.*, 805 F.3d at 1005 (quotation omitted). Finally, we are bound by an ALJ's credibility determinations unless "they are 'inherently unreasonable,' 'self-contradictory,' or 'based on an inadequate reason.'" *Id.* (quotation omitted).

But this deferential standard is not merely a "rubber[]stamp" on agency decisionmaking. *NLRB v. Deauville Hotel*, 751 F.2d 1562, 1567 (11th Cir. 1985). We will not enforce a Board decision that "base[d] its decision on facts that are not supported by the record" or "misconstrue[d] or fail[ed] to consider important evidence." *Northport Health Servs.*, 961 F.2d at 1550. And we will not enforce a Board decision that fails to engage in reasoned decisionmaking. *NLRB v. Gimrock Const., Inc.*, 247 F.3d 1307, 1309 (11th Cir. 2001). The Board's decision must be "logical and rational," and our task is to "examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its decision." *Id.* (quotation omitted).

## III.    DISCUSSION

In its petition for review, Ridgewood raises three challenges to the Board's order. First, Ridgewood contends that it did not coercively interrogate Preferred applicants during job interviews. Second, it argues that the Board's discriminatory hiring finding is not supported by substantial evidence. And third, it argues that it

18

was not a *Burns* successor and was not obligated to recognize and bargain with the Union or respond to the Union's information requests.  The Board's General Counsel argues that we should enforce the Board's order in full.  We agree with Ridgewood on each point.

A.    Coercive Interrogation Charge

First, we consider whether Ridgewood violated § 158(a)(1) of the Act by coercively interrogating Preferred employees about their union membership during job interviews.

The Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing."  29 U.S.C. § 157.  The Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [those] rights."  29 U.S.C. § 158(a)(1).  "An employer violates [that prohibition] when its actions would reasonably tend to coerce employees in the exercise of protected . . . rights."  *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1421 (11th Cir. 1998).

"An employer with a legitimate cause to inquire may interrogate employees on matters which relate to their [collective bargaining] rights without" violating § 158(a)(1).  *TRW, Inc. v. NLRB*, 654 F.2d 307, 314 (5th Cir. Unit A 1981).  Thus, employee interrogations are not per se violations of § 158(a)(1).  *Id.*; *see Delco-*

19

*Remy Div., Gen. Motors Corp. v. NLRB*, 596 F.2d 1295, 1309 (5th Cir. 1979)

(same).  An interrogation crosses the line only when "the words themselves or the

context in which they are used . . . suggest an element of coercion or interference."

*Delco-Remy*, 596 F.2d at 1309 (quotation omitted); *see NLRB v. Brewton*

*Fashions, Inc., a Div. of Judy Bond*, 682 F.2d 918, 921 (11th Cir. 1982) (same).

"The presence of coercive tendencies in a particular instance of an employer's

conduct is to be determined in light of the totality of the circumstances in which

that particular instance of conduct occurred."  *TRW-United Greenfield Div. v.*

*NLRB*, 637 F.2d 410, 415–16 (5th Cir. 1981); *Oil Capitol Sheet Metal, Inc.*, 349

N.L.R.B. 1348, 1355 (2007) (same).  Under the totality-of-the-circumstances test,

we consider a non-exhaustive list of factors:

> (1) the history of the employer's attitude toward its employees; (2) the
> type of information sought; (3) the rank of the official of the employer
> in the employer's hierarchy; (4) the place and manner of the
> conversation; (5) the truthfulness of the employee's reply; (6) whether
> the employer has a valid purpose in obtaining information concerning
> the union; (7) whether this valid purpose, if existent, is communicated
> to the employees; and (8) whether the employer assures the employees
> that no reprisals will be taken if they support the union.

*NLRB v. Gaylord Chem. Co.*, 824 F.3d 1318, 1333 (11th Cir. 2016) (quotation

omitted).  Our analysis "goes beyond examining a list of factors and then

comparing the number that favor the employer to the number that favor the union."

*TRW, Inc.*, 654 F.2d at 314 (quotation omitted).  Rather, "a determination of

whether the interrogation tends to be coercive rests on a consideration of the eight factors in light of the total circumstances of the case." *Id.* (quotation omitted).

The Board failed to analyze the *Gaylord* factors. Indeed, the Board's entire discussion of coercive interrogation appeared in a single sentence: "[Ridgewood] initially demonstrated animus—and independently violated [the Act]—by coercively interrogating Preferred employee applicants regarding their union membership during job interviews." That bald assertion cannot stand because the Board failed to engage in reasoned decisionmaking. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("[A]djudication is subject to the requirement of reasoned decisionmaking."). Under the requirements of reasoned decisionmaking, the Board's decision can stand only if we are able to "examine carefully both the Board's findings and its reasoning, to assure [ourselves] that the Board has considered the factors which are relevant." *Gimrock Const., Inc.*, 247 F.3d at 1309 (quotation omitted). Here, the Board plainly failed to state the relevant standard or analyze the circumstances to determine whether the interview questions were coercive.[17] It simply declared as a matter of law that Ridgewood

---

[17] Although the ALJ also concluded that Ridgewood coercively interrogated Preferred job applicants, the ALJ's decision lends no support to the Board's decision because the ALJ's decision suffers from the same flaw. The ALJ found that "[s]ome employees were asked by Brown, Holland and/or Warren about their wages, benefits and paycheck deductions and/or whether they were members of the Union." But the ALJ never analyzed whether these interrogations were coercive.

violated § 158(a)(1) by interrogating Preferred applicants about their union membership.

Generally, when an agency fails to engage in reasoned decisionmaking, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (quotation omitted); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). But "the rule in *Chenery* [does] not require[] courts to remand in futility." *Fla. Dep't of Lab. & Emp. Sec. v. U.S. Dep't of Lab.*, 893 F.2d 1319, 1324 (11th Cir. 1990) (quotation omitted). Remand is futile when "[o]nly one conclusion would be supportable." *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001) (quotation omitted). Here, "[r]emand is unnecessary" because "[t]here is no indication in either the ALJ's or the Board's decision that the[] criteria were applied" and "the record is sufficiently clear to enable us to apply the[] criteria." *Delco-Remy*, 596 F.2d at 1309–10. Thus, we proceed to address the question of coercion on the merits.

We begin by identifying the factors in order as they apply to the facts of this case. First, the history of Ridgewood's attitude towards its employees was mixed because Brown actively recruited Preferred employees and provided them with an exclusive three-week period to apply to Ridgewood but later opposed unionization. Second, Ridgewood sought Union membership information for four (out of 64)

Preferred applicants and four additional applicants were asked about benefits or payroll deductions.[18]  Third, the questions were asked by high-level managers. Fourth, the questions were asked during job interviews.  Fifth, the applicants answered truthfully, and no applicant testified that the questions were coercive or intimidating.  Sixth, Ridgewood may have had a valid reason to ask the questions to ascertain its payroll obligations, though the ALJ "assume[d] that a company assuming the operations of a facility would already have a sense of the total payroll and benefits costs involved in running the business."  Seventh, the purpose of the questions was not communicated to the applicants.  And eighth, Ridgewood made no promise that reprisals would not occur.

Considering the *Gaylord* factors in light of the total circumstances of this case, the record evidence can support only one conclusion: Ridgewood did not coercively interrogate Preferred job applicants.  *See Fogg*, 254 F.3d at 111 (explaining that remand is futile when "[o]nly one conclusion would be supportable" (quotation omitted)).

To begin, the fact that the seven applicants who were asked about Union membership and payroll deductions answered truthfully (two others even volunteered that information) favors Ridgewood.  Truthful answers cut against any suggestion that "the words themselves or the context in which they are used . . .

---

[18] One applicant, Stephanie Eaton, was asked both sets of questions.

23

suggest an element of coercion or interference." *Delco-Remy*, 596 F.2d at 1309 (quotation omitted). Moreover, we note that the *Gaylord* factors are "not exhaustive," *TRW-United Greenfield Div.*, 637 F.2d at 416, and other factors favor Ridgewood here. First, not a single Preferred applicant who was asked about Union membership or payroll deductions suffered an adverse consequence. To the contrary, every applicant who was asked about Union membership was offered a job at Ridgewood. Second, there was no systematic effort to inquire about Union status. Brown testified that she never instructed Ridgewood officials to ask about Union membership, and the questions were not asked consistently. Indeed, only seven out of 64 Preferred applicants were asked about Union membership or deductions. And third, not a single Preferred applicant testified that their interview suggested an element of coercion. Notably, two applicants who were not questioned about Union membership *volunteered* that they belonged to the Union.

Other factors are neutral. The history of Ridgewood's attitude towards its employees is mixed because, although Brown expressed optimism that she would hire "99.9" percent of Preferred employees and offered them an exclusive, weeks-long period to apply to Ridgewood, she consistently stated that a union was unnecessary at Ridgewood.[19] Furthermore, the record does not establish whether

---

[19] We reject the General Counsel's reliance on Ridgewood's assertions that a Union was unnecessary at its facility as evidence that Ridgewood had a history of a negative attitude

Ridgewood had a valid purpose in asking about some applicants' benefits and deductions.[20] And because the record does not establish whether Ridgewood had a valid reason for asking the questions, the related question of whether the valid purpose is communicated to the employees does not carry any weight in our analysis.

Although some factors favor the Board's position, they are not dispositive because they do not show that the questions tended to coerce. The General Counsel argues that the questions about deductions and union membership to seven applicants were coercive under the *Gaylord* factors because the questions were asked (1) by high-level company officials (2) during job interviews (3) in the

---

towards its employees. The Act provides that the "expressi[on] of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute *or be evidence of* an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (emphasis added). Brown (on behalf of Ridgewood) had every right to express her views on unionization, provided that her statements were nonthreatening. And, as we will explain below, none of Brown's statements ever constituted a threat, so the General Counsel's reliance on Ridgewood's general opposition to unionization is unavailing.

[20] We reject the suggestion that Ridgewood had no valid reason for asking about deductions because, as the ALJ put it, "[o]ne would reasonably assume" that Ridgewood already had a sense of its payroll obligations. Speculation is not substantial evidence. *See DeLong Equip. Co. v. Wash. Mills Electro Mins. Corp.*, 990 F.2d 1186, 1201 (11th Cir. 1993) ("The burden of putting forth substantial evidence is not satisfied by mere speculation and guess work." (quotation omitted)).

context of Ridgewood's repeated assertions that it was opposed to a union.[21]  We

disagree.

To be sure, the fact that senior Ridgewood officials asked about Union

membership, benefits, and payroll deductions in a handful of job interviews are

three factors that favor the Board's position.  But the General Counsel cannot

assert, in conclusory fashion, that because the questions were asked by high-level

officials during job interviews, the interview questions necessarily support a

coercive interrogation charge.  Questions about Union membership, payroll, and

benefits themselves are not illegal per se.  *TRW, Inc.*, 654 F.2d at 314.  Instead, the

General Counsel must show that "the words themselves or the context in which

they are used . . . suggest an element of coercion or interference."  *Delco-Remy*,

596 F.2d at 1309 (quotation omitted).  The General Counsel cannot meet that

standard on this record.  As we have explained, the Preferred applicants answered

truthfully, and some even volunteered Union membership.  There is simply no

---

[21] Ridgewood argues that neither the Board nor the ALJ analyzed whether the questions tended to show coercion and, thus, the Board's finding amounts to a per se rule that questioning employees about union membership is an unfair labor practice.  The General Counsel contends that we are jurisdictionally barred from considering this argument because Ridgewood failed to raise it in its exceptions brief before the Board.  *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court [of appeals].").  The General Counsel is mistaken.  In its brief to the Board, Ridgewood "except[ed] to the ALJ's finding that they violated . . . the Act through unlawful interrogation of employees."  That exception is sufficiently broad to preserve Ridgewood's current position.  *See In re Home Depot Inc.*, 931 F.3d 1065, 1086 (11th Cir. 2019) ("[T]here is a difference between raising new issues and making new arguments on appeal.  If an issue is 'properly presented, a party can make any argument in support of that [issue]; parties are not limited to the precise arguments they made below.'" (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992))).

evidence in the record that shows that even a single applicant who was questioned about Union membership or payroll deductions felt intimated or coerced. Apart from asserting that the questions were asked, the General Counsel cannot show that "the words themselves or the context in which they are used . . . suggest an element of coercion or interference." *Id.* (quotation omitted).

In short, the record as a whole does not support the position that the questions "suggest[ed] an element of coercion or interference." *Id.*(quotation omitted). Accordingly, Ridgewood's interview questions did not violate the Act.

B.    Discriminatory Hiring Charge

Next, we consider whether Ridgewood violated § 158(a)(1) of the Act by engaging in a discriminatory hiring scheme to avoid an obligation to bargain with the Union.

As noted, it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their rights to join or participate in a union. 29 U.S.C. § 158(a)(1). It is also an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3); *see also Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 262 n.8 (1974) ("[I]t is an unfair labor practice for an employer to discriminate in

27

hiring or retention of employees on the basis of union membership or activity.").

Relevant here, "a new owner [can]not refuse to hire the employees of [her]

predecessor solely because they were union members or to avoid having to

recognize the union." *Howard Johnson Co.*, 417 U.S. at 262 n.8; *NLRB v. Hous.*

*Distrib. Servs., Inc.*, 573 F.2d 260, 263–64 (5th Cir. 1978) (same).

In *Wright Line*, the Board articulated a burden shifting test to determine

whether an employer engaged in discriminatory hiring.  251 N.L.R.B. at 1088–89.

The Supreme Court approved the *Wright Line* test, *NLRB v. Transportation*

*Management Corp.*, 462 U.S. 393, 400–04, (1983), *abrogated in part on other*

*grounds by Director, Office of Workers' Compensation Programs v. Greenwich*

*Collieries*, 512 U.S. 267 (1994), and we apply it to determine whether an employer

violated the Act, *Allied Med. Transp*, 805 F.3d at 1007.  Under the first step of the

*Wright Line* test, the Board "must show by a preponderance of the evidence that a

protected activity was a motivating factor in the employer's [adverse] decision."

*Northport Health Servs.*, 961 F.2d at 1550 (quotation omitted).  Next, "the

employer can show as an affirmative defense that it would [not] have [hired] the

employee for a legitimate reason regardless of the protected activity."  *Id.*

(quotation omitted); *NLRB v. S. Fla. Hotel & Motel Ass'n*, 751 F.2d 1571, 1579

(11th Cir. 1985) ("The employer must prove this affirmative defense by a

preponderance of the evidence.").  Finally, the Board "may then offer evidence that

28

the employer's proffered 'legitimate' explanation is pretextual." *Northport Health Servs.*, 961 F.2d at 1550 (quotation omitted).  "Motive is a question of fact, and the Board may rely upon direct and circumstantial evidence to infer anti-union motive." *McClain of Ga., Inc.*, 138 F.3d at 1424.

The Board concluded that Ridgewood's refusal to hire Davis, Eads, Sickles, and Wilson was part of a discriminatory scheme to avoid hiring a majority of Union members, which would have triggered an obligation to bargain with the Union.  The Board inferred discrimination based on anti-union animus because it found that (1) Ridgewood coercively interrogated Preferred job applicants regarding Union membership, (2) Brown threatened to close the Ridgewood facility if its employees unionized, and (3) Cooper threatened to fire Bolinger if she had been involved in union organizing.  The Board then rejected as "pretextual" Ridgewood's affirmative defense that it would not have hired Davis, Eads, Sickles, and Wilson anyway under its "no-rehire" policy.

The General Counsel contends that the Board's decision is supported by substantial evidence.  We will address each piece of evidence on which the Board relied in determining that Ridgewood engaged in a discriminatory hiring scheme.

1.    Coercive Interrogation

The Board found that Ridgewood demonstrated its discriminatory hiring scheme and anti-union animus "by coercively interrogating Preferred employee

29

applicants regarding their union membership during job interviews" from August to September 2013.  The Board did not elaborate further.

Given the Board's failure to explain its coercive interrogation finding, as noted above, Ridgewood advances two arguments.  First, it argues that the Board erred by equating a coercive interrogation finding (in which the speaker's intent is irrelevant) with a discriminatory intent finding (in which the speaker's intent is relevant) without a reasoned basis.[22]  And second, Ridgewood contends that the interview questions do not reflect anti-union animus.

The Board argues that, under settled Board precedent, the Board may rely on the existence of other unfair labor practices—which do not require intent—as evidence of animus.  *See, e.g.*, *The Fremont-Rideout Health Grp.*, 357 N.L.R.B. 1899, 1902 n.14 (2011); *Dico Tire, Inc.*, 330 N.L.R.B. 1252, 1260 (2000).

Because we have already explained why Ridgewood did not coercively interrogate Preferred job applicants, however, the interview questions are not substantial evidence supporting the Board's discriminatory hiring determination. *See Northport Health Servs.*, 961 F.2d at 1550.

---

[22] The Board contends that Ridgewood also failed to raise this issue before the Board. The Board is mistaken again.  Ridgewood contended in its exceptions brief that the mere fact that "some employees were . . . asked if they were members of the union" was "not sufficient for [a finding of] animus."  That exception is sufficiently broad to preserve Ridgewood's argument. *See In re Home Depot Inc.*, 931 F.3d at 1086.

2.    Brown's January 2014 Statement

At a meeting in January 2014, after Ridgewood completed interviewing Preferred employees in September 2013, and after Ridgewood assumed operation of the facility on October 1, 2013, Brown met with a group of Ridgewood employees.  An employee asked Brown whether "if we had a union in there, they would shut the place down."  Brown responded that it was "a possibility."  The Board inferred anti-union animus from that statement, which it characterized as Brown's "threat[] that she might close the facility if employees unionized."  And it concluded that that animus motivated her decision not to hire Davis, Eads, Sickles, and Wilson.

Brown's statement that she might have to close the facility if its employees unionized does not support a finding that anti-union animus motivated Brown to refuse employment to Davis, Eads, Sickles, and Wilson.  First, we note that the Board's conclusions "are less likely to rest upon substantial evidence" when it "misconstrues . . . important evidence."  *Northport Health Servs.*, 961 F.2d at 1550.  Here, the Board misconstrued Brown's statement when it described it as a threat.  On its face, Brown's statement was not threatening.  And no witness described it as threatening.

Second, there is, of course, nothing unlawful about a company's opposition to a union.  *See, e.g.*, *Fla. Steel Co.* 587 F.2d at 753 ("It is fundamental that the

31

Board has no authority to punish a company because it is against a union. Any company has a perfect right to be opposed to a union, and such opposition is not an unfair labor practice."); *BE & K Const. Co. v. NLRB*, 133 F.3d 1372, 1376–77 (11th Cir. 1997) (same); *NLRB v. Lampi, LLC*, 240 F.3d 931, 936 (11th Cir. 2001) ("The Board was therefore not free to infer antiunion animus from [Lampi's president's] statement that Lampi was 'against' unions or the announcement that Lampi would appeal the ALJ's ruling on the allegations stemming from the election."). It is well established that "[a] finding of unlawful motivation cannot be based *solely* on the anti-union stance of an employer." *BE & K Const. Co.*, 133 F.3d at 1377 (quoting *Weather Tamer, Inc. v. NLRB*, 676 F.2d 483, 492 (11th Cir. 1982)) (emphasis added); *Fla. Steel Corp. v. NLRB*, 587 F.2d 735, 744 (5th Cir. 1979) ("An unlawful motivation in [an employer's hiring decisions] cannot be based solely on the general bias or anti-union attitude of the employer . . . but must be established by other facts in each individual case.").

And third, § 158(c) makes it clear that an employer's anti-union expression may not be used as evidence of an unlawful motivation if that expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Thus, the relevance of Brown's statement turns on whether it was threatening. The Board's own precedent acknowledges that it is not a threat for an employer to acknowledge

32

the possibility that a facility may close if a union is organized.  For example, in

*Miller Industries Towing Equipment, Inc.*, the Board recognized that:

> [A]n employer is free to communicate to his employees any of his
> general views about unionism or any of his specific views about a
> particular union, so long as the communications do not contain a
> 'threat of reprisal or force or promise of benefit.'  He may even make
> a prediction as to the precise effects he believes unionization will have
> on his company.

342 N.L.R.B. 1074, 1085 (2004) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S.

575, 618 (1969)).  In that case, the Board affirmed an ALJ's determination that it

was not unlawful for an employer to tell employees that there was a "possibility of

plant closures if there is a Union due to costing the Company money."  *Id.* at 1075.

The Board held that "general references to 'possibilities' are inadequate to

establish that [the employer] threatened" employees.  *Id.*; *see also Walter Garson,

Jr. & Assocs.*, 276 N.L.R.B. 1226, 1226, 1231 (1985) (holding that an employer

did not threaten its employees by saying "I really hope you people may have

realized what you are doing [and] that the possibility exist[s] that if the Union

would come in here . . . the place may have to close").  Those decisions are

indistinguishable from this case, and the Board should have followed—or at least

acknowledged—its own precedent.[23]  We do so now and hold that Brown's

---

[23] We note that in *Gissel*, the Supreme Court also cautioned employers to choose their language carefully.  It warned that "prediction must be carefully phrased on the basis of objective fact."  395 U.S. at 618.  Thus, "[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known

statement was not threatening.  Therefore, the statement is insufficient evidence of unlawful motivation.

Finally, even if Brown's statement was a threat, there is no nexus between Ridgewood's September 2013 hiring decisions and Brown's subsequent January 2014 statement.  The Board's "*prima facie* case must demonstrate a nexus between the employer's anti-union sentiments and the precise adverse action taken." *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 47 (D.C. Cir. 2020); *Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 886 (8th Cir. 2018) (same).

The Board relied on three cases to show that later-in-time incidents can demonstrate that anti-union animus motivated earlier hiring decisions.  Each is distinguishable.  In *R.J. Corman Railroad Construction, L.L.C.*, the Board found anti-union animus and sustained an unfair labor practice charge for statements a company's superintendent made mere days after refusing to hire union organizers. 349 N.L.R.B. 987, 989 (2007).  In *K. W. Electric, Inc.*, the Board held that a company discriminatorily discharged two employees for their union activity.  342 N.L.R.B. 1231, 1231 (2004).  The company was aware of the employees' union

---

only to him, the statement is . . . a threat of retaliation based on misrepresentation and coercion." *Id.*  Those words of caution need not concern us here because the Board has not met its burden to identify record evidence that suggests that Brown's vague statement was based on something other than economic realities.  To the contrary, the record establishes that the Ridgewood facility faced financial pressures—Preferred was unable to make lease payments, which brought about the transition.  The facility required maintenance, supplies were low, and staff were overworked. And Brown could not guarantee that Ridgewood could afford to match the wages and benefits that employees received from Preferred.

34

activity and the company's owner and his agent made several anti-union statements—three weeks after the first discharge, and two days before the second discharge. *Id.* In the Board's view, "[t]hese statements conveyed an unmistakable message of the [company's] antiunion animus." *Id.* And in *SCA Tissue North America, LLC*, the Board inferred anti-union animus from numerous incidents—including a "parting remark" directed at an employee just days after his discharge—to find that a company discriminatorily discharged a union organizer. 338 N.L.R.B. 1130, 1135–36 (2003), *enforced*, 371 F.3d 983 (7th Cir. 2004). In these cases, the anti-union statements were made within days of the adverse hiring decisions. Such proximity is not present here as Brown raised the possibility of closure of the facility in the event of unionization months after the adverse hiring decisions were made.

The General Counsel's responses are unavailing. The General Counsel argues that Ridgewood does not contest that Brown made the statement and that the Board was justified in relying on this "most serious threat." But Brown did not threaten Ridgewood employees. The General Counsel also attempts to cast doubt on the truthfulness of Brown's statement because Ridgewood never identified any factual basis to show that Brown's statement was "based on economic realities." This contention flips the evidentiary burden on its head. Under the first step of the *Wright Line* test, it is the Board's burden to show that Brown's statement

35

amounted to anti-union animus. *Northport Health Servs.*, 961 F.2d at 1550. It has failed to meet that burden here.[24]

Accordingly, Brown's statement about the possibility of the Ridgewood facility closing if its employees unionized is not substantial evidence in support of the Board's conclusion that Ridgewood engaged in a discriminatory hiring scheme motivated by anti-union animus. *See id.*

### 3.    Cooper's January 2014 Statement

The Board also inferred a discriminatory motive from Cooper's January 2014 threat to terminate Bolinger if Bolinger engaged in union organization. The

---

[24] The General Counsel also responds that even a statement like Brown's that was not alleged to have violated the Act "may be used to shed light on the motive for, or the underlying character of, other conduct that is alleged to violate the Act." *Am. Packaging Corp.*, 311 N.L.R.B. 482, 484 n.1 (1993). But, as the statute makes clear, an employer's anti-union expression may not be used as evidence of an unlawful motivation if that expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). We reject the General Counsel's position to the extent it suggests otherwise and join the company of our sister circuits in so doing. *See Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1112 (D.C. Cir. 2002) (rejecting the Board's reliance on "two statements" that "do not even remotely constitute evidence of a 'threat of reprisal or force or promise of benefit'" (quoting 29 U.S.C. § 158(c))) (collecting cases); *Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 676 (D.C. Cir. 2001) (explaining that when the Board found that there was "no sufficient objective basis" for finding that employees viewed a statement as a threat, § 158(c) "plainly bars the Board not only from finding the speech was an unfair labor practice . . . but also from using it as 'evidence of an unfair labor practice.'").

In a prior decision, we held that a company's lawful expression of opposition to a union was appropriate "'background' against which to measure [other] statements, conduct, and the like made by other management spokesmen." *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 103 (5th Cir. 1963). We elaborated that this "background" "would bear on the question whether, from the listeners' point of view, these [other] statements by subordinate management constituted forbidden coercion, threats, or intimidation." *Id.* at 104. *Hendrix* is consistent with our decision today. *Hendrix* does not say that the lawful statement *itself* would be evidence of unlawful motive. Rather, *Hendrix* explains that it may shed light on whether other statements would have been perceived as threats.

General Counsel contends that a nexus exists between Cooper's January 2014 threat and Ridgewood's September 2013 hiring decisions because Cooper advised Brown on at least two hiring decisions (including the decision not to hire Wilson), Brown accepted Cooper's recommendations on both occasions, and the Board properly linked Cooper's threat to Brown's position in October 2013 that a union was unnecessary at Ridgewood.  Ridgewood argues that there is no nexus between Cooper's threat and the hiring decisions, in part because the Board cannot "retroactively impute" animus from the statement of a non-decisionmaker.[25]  We agree with Ridgewood.

*First*, Cooper's threat occurred in January 2014, months after the relevant hiring decisions were made in September 2013.  Thus, Cooper's threat is just as far removed from the adverse hiring decisions as Brown's statement.  And for the reasons we have explained relating to Brown's statement, so too the timing of Cooper's threat does not establish a nexus to the adverse decisions.  *Napleton 1050, Inc.*, 976 F.3d at 47.

*Second*, "the Board may not simply 'impute' the [anti-union animus] of a lower-level supervisor to the decision-making supervisor."  *Pioneer Nat. Gas Co.*

---

[25] The Board contends that Ridgewood failed to raise this issue before the Board.  The Board is mistaken.  In its exceptions brief, Ridgewood argued that Cooper "was not involved in the interviews or hiring decisions of the former-Preferred employees" and that a "threat by a non-decisionmaker who was not employed at the time, months after the transition cannot demonstrate animus during the hiring process."

37

*v. NLRB*, 662 F.2d 408, 412 (5th Cir. Unit A 1981).  It may, however, rely on "circumstantial evidence" that the lower-level supervisor's animus was shared by the person responsible for making the hiring decisions.  *Id.*  Here, there is no reasonable basis to impute Cooper's animus to Brown.  Cooper was not employed by Ridgewood during the 2013 hiring process.  There is no evidence that Cooper's advice to Brown was motivated by a desire to avoid bargaining obligations.  There is no evidence that Cooper made the threat on behalf of Brown or because of any communication with Brown.  And the fact that Brown received Cooper's input on two out of 65 applicants in September 2013 does not establish that Cooper exercised any significant decisionmaking authority.  In sum, there is no basis to impute Cooper's anti-union animus to Brown's decisionmaking, which occurred several months prior.  Accordingly, Cooper's statement is not substantial evidence supporting the Board's discriminatory hiring charge.[26]

\* \* \*

For these reasons, we hold that the Board's discriminatory hiring finding is not supported by substantial evidence and, thus, the Board failed to meet its burden under the *Wright Line* test.  Accordingly, we need not address Ridgewood's

---

[26] In its opening brief, Ridgewood did not contest the Board's finding that Cooper's threat was an independent violation of the Act.  Ridgewood conceded at oral argument that the Board is entitled to enforcement of that charge.  Thus, we will grant the Board's petition for enforcement as to that charge.

affirmative defense that it would not have hired Davis, Eads, Sickles, and Wilson under its "no-rehire" policy and deny enforcement of the Board's discriminatory hiring charge.

C.    *Burns* Successorship

Having determined that the Board's discriminatory hiring finding is unsupported by substantial evidence, we consider next whether the Board was correct in determining that Ridgewood was a *Burns* successor to Preferred and, therefore, obligated to bargain with the Union.

Under *Burns*, a successor employer is obligated to bargain with the predecessor union when (1) there is a "substantial continuity" of business operations "between the enterprises," and (2) a majority of the successor's substantial complement of employees was employed by the predecessor. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43–47 (1987); *see Computer Scis. Corp. v. NLRB*, 677 F.2d 804, 806 (11th Cir. 1982). Ridgewood does not dispute that the first element is met here. Thus, we must decide whether former Preferred employees comprised a majority of Ridgewood's workforce on October 1.[27]

---

[27] The ALJ and the Board identified October 1 as the relevant date for determining majority status. Ridgewood disputes that finding because it continued to hire more employees in the weeks that followed. We will assume that October 1 is the relevant date because it does not affect the outcome of this case.

On October 1, 2013, 101 employees reported for work (49 former Preferred employees and 52 non-Preferred employees). Thus, former Preferred employees did not comprise a majority of the work force. To circumvent that problem, the Board found that Davis, Eads, and Sickles deserved to be hired and that Ridgewood discriminated against them in order to avoid hiring a majority of Preferred employees. The Board then reasoned that "because [Ridgewood] completed [its] hiring of incumbent Preferred employees before hiring new, non-Preferred applicants, it follows that [Ridgewood] would have hired fewer non-Preferred applicants had they lawfully extended job offers to the four discriminatees." Applying this one-in-and-one-out approach, the Board concluded that, absent discrimination, "former Preferred employees would have constituted a majority of [Ridgewood's] initial complement of unit employees." Thus, the Board ruled that Ridgewood was a *Burns* successor that was obligated to bargain with the Union.

But as we explained, Ridgewood did not engage in discriminatory hiring. Thus, the Board had no legal justification for shuffling the deck of employees to achieve a theoretical Union majority. The fact remains that on October 1, former Preferred employees did not comprise a majority of Ridgewood's employees. Accordingly, the Board erred in concluding that Ridgewood was a *Burns* successor to Preferred based on its theory of discriminatory hiring. As a consequence, we

40

grant Ridgewood's petition for review as to the related charges against it—refusing to recognize and bargain with the Union, refusing the Union's information requests, and notifying employees that they were not represented by the Union.

Furthermore, even if the three former Preferred employees had not been excluded by Ridgewood's no-rehire policy, former Preferred employees would still not have made up the majority of Ridgewood's newly constituted workforce. The Board's one-in-one-out theory requires us to assume that Ridgewood was capping its workforce at 101 and that the three former Preferred employees would have also replaced any new non-Preferred hires. The record undisputedly shows that Ridgewood offered employment to 53 former-Preferred employees, more than enough to make up a majority of its initial batch of 101. It is also undisputed that Ridgewood continued to hire additional employees well beyond October 1. The record does not support an assumption that Ridgewood capped its hiring at 101 employees and that there would have been a majority of Preferred employees even if Preferred had offered employment to Davis, Eads, and Sickles.

## IV. Conclusion

For these reasons, we grant Ridgewood's petition for review in full. Because Ridgewood does not contest the Board's determination that Cooper's threat was an unfair labor practice under § 158(a)(1), we grant the General

41

Counsel's petition for enforcement of that finding.  We deny enforcement in all other respects.

**Petition GRANTED and cross-petition for enforcement DENIED in part.**